Willard A. SHARETTE, David, Goldman, and Esta Goldman, Individually and on Behalf of All Others Similarly Situated, Plaintiffs,

v.

CREDIT SUISSE INTERNATIONAL, a foreign company, Credit Suisse Securities (USA) LLC, a Delaware limited liability Company, and Does 1–100, Defendants.

No. 14–cv–8486 (VM).

United States District Court,
S.D. New York.

Signed Aug. 20, 2015.

Gary Vance Mauney, Lewis & Roberts, PLLC, Charlotte, NC, James A. Roberts, III, Lewis and Roberts PLLC, Raleigh, NC, Hal Davis Cunningham, Scott + Scott, Attorneys at Law, LLP, San Diego, CA, Joseph Peter Guglielmo, Deborah Clark–Weintraub, Thomas L. Laughlin, IV, Scott + Scott, L.L.P., New York, NY, for Plaintiffs.

Patrick E. Gibbs, Allison S. Davidson, Latham & Watkins, LLP, Menlo Park, CA, for Defendants.

### *DECISION AND ORDER*

VICTOR MARRERO, District Judge.

I. BACKGROUND ...................................................68
 A. TWO OFFERINGS OF ECD STOCK ...................................68
 B. SHORT SALES OF ECD STOCK SKYROCKET WHILE THE PRICE OF ECD STOCK PLUMMETS, SENDING ECD INTO BANKRUPTCY ...................................69
 C. THE CREDIT SUISSE DEFENDANTS' ALLEGED MISREPRESENTATIONS AND MANIPULATIVE SCHEME ...................................70
 1. Convertible Notes, Short Sales, and "Hedging" ...................................70
 2. Short Sales With Almost No Risk; Misaligned Investor And Shareholder Interests ...................................71
 3. Allegations Against the Credit Suisse Defendants ...................................73

II. CHOICE OF LAW ...................................................74

III. JUDICIAL NOTICE ...................................................74

IV. LEGAL STANDARD ...................................................75
 A. RULE 12(b)(6) MOTION TO DISMISS ...................................75
 B. THE EXCHANGE ACT ...................................................76
 1. Section 10(b), Rule 10b–5, and Section 9 ...................................76
 2. Market Manipulation ...................................................77
 3. Misstatements or Omissions of Material Fact ...................................78
 4. Scienter ...................................................79
 5. Loss Causation ...................................................80

V. DISCUSSION ...................................................80
 A. ACTS OF MARKET MANIPULATION ...................................80
 1. Manipulative Acts Under Section 10(b) and Rule 10b–5 ...................................81
 a. *ATSI* and *Cohen* ...................................................81
 b. "Something More" ...................................................82
 c. "Legitimate" Hedging ...................................................83
 2. The Credit Suisse Defendants' Participation in Manipulative Acts Under Section 10(b) and Rule 10b–5 ...................................84
 B. MISSTATEMENTS OR OMISSIONS OF MATERIAL FACT ...................................86
 1. The Existence of Misleading Statements Under Section 10(b) and Rule 10b–5 ...................................86
 a. Accuracy and Disclosure ...................................................87
 b. False When Made ...................................................89
 2. Misstatements "Made" by the Credit Suisse Defendants under Section 10(b) and Rule 10b–5 ...................................90
 C. SCIENTER ...................................................93
 1. Motive and Opportunity ...................................................94
 2. Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness ...................................96
 a. Structure of Offerings ...................................................97
 b. Solicitation Conversations Prior to the Offerings ...................................99
 c. High–Volume Short Selling After the Offerings ...................................100

 3. Facts Considered Collectively ..................................... 100
 D. LOSS CAUSATION ......................................... 102
 1. Loss Causation With Regard to Market Manipulation ................ 103
 2. Loss Causation with Regard to Misstatements and Omissions .......... 103

VI. **ORDER** ................................................. 104

Lead plaintiffs Willard A. Sharette, David Goldman, and Esta Goldman (collectively, "Plaintiffs"), three former shareholders of Energy Conversion Devices, Inc. ("ECD"), brought this suit on behalf of a putative class of "all other persons or entities who purchased or otherwise acquired common stock of [ECD] between June 18, 2008 and February 12, 2012 (the "Class Period")." (Cons.Am. Class Action Compl. ("CACAC"), Dkt. No. 48, at ¶ 1.) They named defendants Credit Suisse International and Credit Suisse Securities (USA) LLC (collectively, the "Credit Suisse Defendants") and asserted various claims pursuant to Sections 9 ("Section 9") and 10(b) ("Section 10(b)") of the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. (the "Exchange Act"), and Rule 10b–5 ("Rule 10b–5") promulgated thereunder, 17 C.F.R. Section 240.10b–5.

Plaintiffs commenced this action in the United States District Court for the Northern District of California on June 17, 2013 (Dkt. No. 1), and filed the CACAC in that court on February 3, 2014. However, on October 14, 2014, The Honorable Saundra Brown, United States District Judge for the Northern District of California, issued an Order, *sua sponte*, requiring the parties to show cause as to why the action should not be transferred to the Southern District of New York, or, in the alternative, to file a stipulation requesting that the case be transferred to the Southern

District of New York pursuant to 28 U.S.C. Section 1404(a) ("Section 1404(a)"). (Dkt. No. 68.) The parties stipulated to an Order (Dkt. No. 69), granted by Judge Brown (Dkt. No. 70), pursuant to which the case was transferred to this Court.

Prior to such transfer, the Credit Suisse Defendants had filed a Motion to Dismiss the CACAC ("Motion" or "Mot.," Dkt. No. 53) pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), and that Motion is presently before the Court. Accompanying their Motion, the Credit Suisse Defendants also filed a Request for Judicial Notice in support of the Motion ("Request for Judicial Notice" or "Req. Jud. Not.," Dkt. No. 54), asking the Court to take judicial notice of eight public documents (Dkt. No. 55). The Request for Judicial Notice, which Plaintiffs have not opposed, is also presently before the Court.

## I. BACKGROUND [1]

### A. TWO OFFERINGS OF ECD STOCK

ECD was a manufacturer of solar power technology. Specifically, it manufactured photovoltaic solar laminates that generated renewable energy by converting sunlight into electricity. ECD's products were particularly suitable for rooftop application, and were manufactured using a proprietary process and technology developed by ECD through almost 30 years of research.

---

[1] The factual summary below, except where otherwise noted explicitly, derives from the CACAC and the documents cited or relied upon for the facts pleaded therein, which the Court accepts as true for the purposes of ruling on a motion to dismiss. *See Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 180 (2d Cir.2008) (*citing GICC Capital Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 465 (2d Cir.1995)); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.2002). Except where specifically quoted, no further citation will be made to the CACAC or the documents referred to in it.

In 2008, to boost production as demand for its products grew, ECD needed to raise capital. To this end, ECD entered into a share lending agreement (the "Share Lending Agreement") with the Credit Suisse Defendants, who agreed to serve as the lead underwriters for two offerings of ECD stock that were made in tandem. The principal offering (the "Convertible Notes Offering") involved $316 million in notes convertible into ECD common stock (the "Convertible Notes") and the second securities offering (the "Common Stock Offering," collectively the "Offerings") involved 4,714,975 shares of ECD common stock ("ECD Stock"). Through the Common Stock Offering, ECD created a pool of 3,444,975 shares that were made available to the Credit Suisse Defendants to lend out pursuant to the Share Lending Agreement, while the remaining 1,270,000 shares were sold by the Credit Suisse Defendants directly to investors. In the Share Lending Agreement, the Credit Suisse Defendants agreed that the Credit Suisse Defendants would use the ECD stock

> solely for the purpose of directly or indirectly ... facilitating the sale and the hedging of the Convertible Notes by the holders thereof or, ... with the prior consent of the Lender, facilitating the sale and the hedging of any additional convertible securities the Lender may issue from time to time by the holders thereof.

(CACAC ¶ 25 (*quoting* the Share Lending Agreement).)

The Share Lending Agreement was described in two ECD Prospectus Supplements filed with the Securities and Exchange Commission ("SEC") and dated June 18, 2008, one titled "Common Stock" (the "Common Stock Prospectus") and the other titled "3.00% Convertible Senior Notes due 2013" (the "Convertible Notes Prospectus," collectively the "Prospectuses"). As described in the Common Stock Prospectus,

> in advance of the [O]ffering[s], [the] Credit Suisse [Defendants] "solicited indications of interest, based on the purchase price negotiated with those potential purchasers, from convertible notes investors seeking to establish a hedge position" and "established a 'clearing price' for a number of borrowed shares at which both purchasers of our common stock were willing to purchase borrowed shares offered hereby and investors in our convertible notes were willing to establish hedge positions."

(*Id.* ¶ 41 (quoting the Common Stock Prospectus).)

**B. SHORT SALES OF ECD STOCK SKYROCKET WHILE THE PRICE OF ECD STOCK PLUMMETS, SENDING ECD INTO BANKRUPTCY**

The Offerings occurred on June 18, 2008, and the Credit Suisse Defendants lent out for short sales almost all of the 3,444,975 shares ECD had provided, retaining less than 200,000 shares. At the time of the Offerings, the short interest in ECD stock was approximately 6.7 million shares, so the additional approximately 3.2 million shares shorted after the Offerings represented an increase of roughly 48 percent in short interest in ECD stock.

As the volume of short sales of ECD stock rose sharply, the price of ECD stock dramatically plunged, dropping from approximately $72 per share on June 18, 2008, to less than $1 per share in February 2012. In February 2012, ECD filed for bankruptcy protection, causing massive losses to investors.

## C. THE CREDIT SUISSE DEFENDANTS' ALLEGED MISREPRESENTATIONS AND MANIPULATIVE SCHEME

Plaintiffs allege that the rampant shorting of ECD stock after the Offerings, followed by ECD's eventual bankruptcy, was all part of a scheme, orchestrated by the Credit Suisse Defendants, to allow "predatory hedge funds" (*see, e.g.*, CACAC ¶ 2) to reap enormous profits while sending ECD stock into a downward spiral. According to the CACAC, the Share Lending Agreement and the Prospectuses misrepresented that the purpose of the Offerings and the related Share Lending Agreement was to promote the sale of the Convertible Notes by assisting investors in "hedging" their investment in these securities. The CACAC alleges, however, that the Credit Suisse Defendants intended all along to allow predatory hedge funds to place massive negative bets on ECD stock with very little risk, shorting huge amounts of ECD Stock, such that the short sales effectuated could not be considered part of the "legitimate hedging strategy" (*id.* ¶ 28) contemplated by the Share Lending Agreement and described in Prospectuses. Plaintiffs allege that the Credit Suisse Defendants were the "architect[s] of and key participant[s] in" this manipulative scheme. (*Id.* ¶ 5.)

### 1. Convertible Notes, Short Sales, and "Hedging"

A "convertible note" is a hybrid security with characteristics of both stocks and bonds. "Like bonds, convertible notes pay interest (in this case 3%) and have a maturity date (here, June 15, 2013)." (*Id.* ¶ 3.) However, "like stock, the price of convertible notes is more sensitive to the earnings prospects of the issuer than an ordinary bond because each note can be converted to equity." (*Id.*) If the price of a company's stock rises enough, it becomes advantageous to an investor in convertible notes to convert its notes into stock at the maturity date. The interests of a company and a purchaser of its convertible notes are therefore aligned.

"Shorting" or "short selling" stock refers to a process whereby an investor borrows stock from a third party and makes a promise to return the stock to the lender at a later date. The investor then sells the stock, which puts downward pressure on the stock. If the stock price goes down, the investor eventually buys the stock back at the new, lower price and then returns the stock to the lender, having turned a profit. However,

> a short sale exposes the investor to potentially unlimited downside risk because there is theoretically no limit to how high the price of a shorted stock can rise, and the short seller is obligated to purchase the stock at the prevailing market price on the agreed date and return it to its lender

regardless of whether the stock price drops, rises, or stays the same. (*Id.* ¶ 6.) Thus, short selling is essentially a bet *against* a company's stock; the more a stock price drops, the greater a short seller's profit, but the more a stock price rises, the greater a short seller's loss.

Given the properties of convertible notes and short sales, an investor is able to "hedge" against the risk of purchasing a company's convertible notes by coupling the purchase of such notes with short sales of the same company's common stock. When the two investments are made in tandem, if a company's stock prices do drop, causing investors in the company's convertible notes to lose money in the long term, those same investors are able to minimize or recover that loss in the short term when they buy back, at a reduced price, the common stock shares they have shorted.

Plaintiffs allege that "the term 'hedge' in the context of convertible notes specifically refers to a market neutral investment strategy." (Id. ¶ 4. (emphasis added).) According to the CACAC, when "hedging," investors do not make "rampant short sales." (Id. ¶ 26.) Rather, they

short only the number of shares necessary to protect against the downside risk to the notes created by swings in the equity price of the underlying stock, thereby creating a market neutral position. The appropriate number of shares necessary to do this is called the "hedge ratio."

(Id.)

In the case at hand, each individual Convertible Note had a face value of $1,000 and could be converted into 10.892 shares of ECD stock. This valuation meant that a purchaser of a Convertible Note effectively paid $91.80 per share of ECD stock. Since the price of ECD stock was approximately $72 at the time of the Offerings, the price of ECD stock would have had to rise significantly—to a value of at least greater than $91.80—in order for a holder of a Convertible Note to have an incentive to convert the note to ECD stock. The CACAC posits that under conditions such as these, when the market price of the underlying stock is substantially below the conversion price, the hedge ratio is "less than 50 percent of the number of shares that a note can be converted into." (Id.) (citing Thoma, Beat, "Convertible Bonds—Strategies and Concepts," Fisch Asset Management (2013).) Furthermore, the CACAC alleges that

the hedge ratio declines as the price of underlying stock goes down because under these circumstances the convertible note behaves more like a bond and less like a stock. For this reason, an investor pursuing a strategy of hedging an investment in convertible notes will actually start buying the stock of a company when the price of the stock declines, taking downward pressure off the stock and creating buy-side demand that would support the price of the stock. (CACAC ¶ 26.)

Thus, when an investor in convertible notes pursues a "legitimate hedging strategy" by engaging in short sales, even though short sales in isolation constitute a short term bet *against* a company,

the interests of [the hedging] investor . . . are [actually] aligned with those of the underlying company's shareholders because both are 'long' on the Company, that is, both are betting on the Company and hoping *for* its profitability.

(Id. (emphasis added).) In other words, the CACAC alleges, as part of a "hedge," an investor does not short sell in excess of the hedge ratio, attempting to drive down the price of a company's stock and make a profit through buying the stock back at a lower price. Instead, an investor pursuing a hedging strategy shorts only a limited amount of stock in accordance with the hedge ratio, offsetting the risk of investment in that company's convertible notes while maintaining its "long" investment in the company's success.

## 2. *Short Sales With Almost No Risk; Misaligned Investor And Shareholder Interests*

The CACAC asserts that two considerations traditionally limit investors' ability to make short sales. First, as discussed above, short sales have potentially unlimited downside risk because there are technically no bounds to how high the price of a stock can rise. Second, an investor must pay a fee to the lender in order to borrow the stock and short it, and "[t]his fee can be quite high, especially as interest in shorting a stock increases." (Id. ¶ 6.)

Plaintiffs allege that both of these risks were purposefully eliminated by Credit

Suisse when it structured the Offerings. A short seller's potentially unlimited risk due to the possibility of rising stock prices was effectively removed by the conversion option embedded in the Convertible Notes, since investors could ultimately change their Convertible Notes into stock to cover losses incurred through short sales if the price of ECD stock rose. Since each Convertible Note could be converted into 10.8932 shares of ECD stock,

> a hedge fund could short up to this number of shares without running any risk that the price of ECD stock would go up and cause the hedge fund to lose money on its short position. This conversion right acted as an insurance policy on hedge funds' shorting.

(*Id.* ¶ 30.)

Additionally, the borrowing costs traditionally associated with short sales were also all but eliminated, because the Share Lending Agreement provided that the Credit Suisse Defendants would lend ECD stock to investors to short for the nominal fee of only one cent. This fee was allegedly far below market rates, as—according to the CACAC—

> a short seller ordinarily may have to pay a significant percentage of the value of a stock that is difficult to borrow (such as one where the share price is declining as was the case with respect to ECD), *see, e.g.,* D'Avolio, Gene, "The Market For Borrowing Stock," Journal of Financial Economics 66 (2002) ... Thus, whereas it [typically] would have cost ... millions of dollars a year to borrow the roughly 3.4 million ECD shares loaned pursuant to the Share Lending Agreement, the [total] borrowing cost was just $34,000.

(*Id.* ¶ 29.)

The CACAC alleges that this arrangement "created a perfect 'heads I win, tails you lose' investment vehicle [for the Credit Suisse Defendants] to sell to hedge funds."

(*id.* ¶ 31.) This result follows because, as the CACAC further alleges with the support of detailed calculations, pursuant to the structure of the Offerings "a hypothetical hedge fund that purchased a single Convertible Note and who sold short 10.8932 shares, the number of ECD shares that the Note could be converted into[,]" stood to earn more money the further ECD's stock declined, and actually lost money if the stock rose. (*Id.*) In fact, Plaintiffs assert, if such a hedge fund shorted 10.8932 shares of ECD stock at the market price of $72 per share, and ECD's stock price then fell to only $0.02 per share, that hedge fund would make a profit of 519% on its initial investment, with almost all the profit coming from the short sales. In contrast, in the event that ECD's stock prices rose significantly to $150 per share, such a hedge fund would suffer a 19% decline in its investment.

Thus, the CACAC alleges, unlike with a traditional "hedge," in which the interests of shareholders and noteholders are *aligned,* here those interests were *opposed.* In fact, according to Plaintiffs, the potentially massive profits for a hypothetical hedge fund purchasing one Convertible Note and shorting 10.8932 shares would accrue even in the event of ECD's bankruptcy—which ultimately did occur—because

> ECD was a capital—intense Company whose assets allowed for a substantial recovery on the Convertible Notes in bankruptcy. Thus even if the bankruptcy only paid fifty cents on the dollar, an investor in the Note-short sale scheme would still double its money.

(*Id.* ¶ 33.) Furthermore, the relatively low risk to investors of a significant rise in ECD's stock price when shorting 10.8932 shares of ECD stock (only 19% loss if the stock rose to $150 per share) combined with the potential for massive gains if

ECD's stock price plummeted (a generous 519% profit if the stock fell to $0.02 per share and a 100% profit even if ECD fell into bankruptcy), made the Offerings—and the prospect of shorting shares well in excess of the hedge ratio—even more attractive to investors and even more ripe for exploitation by the Credit Suisse Defendants and the "predatory hedge funds." (*Id.* ¶ 5.)

In contrast, the CACAC asserts that if investors had engaged in proper "hedging" of the convertible notes, the incentives would have been drastically different. According to Plaintiffs, who again support their allegations with a detailed set of calculations, a hypothetical hedge fund purchasing one Convertible Note and shorting 5.4466 shares would have a 99% return on its investment if the price of ECD stock plummeted to $0.02 per share and a 67% return on its investment if the price rose to $150. Additionally, such an investor would likely not profit, and could potentially even lose money, in the event ECD declared bankruptcy.

### 3. *Allegations Against the Credit Suisse Defendants*

Plaintiffs allege that the Credit Suisse Defendants, were the "architect[s] of and key participant[s] in" a scheme to manipulate the price of ECD stock to ECD's detriment. (*Id.* ¶ 5.) According to the CACAC, the Credit Suisse Defendants—although hired by ECD to advance ECD's interests as the underwriters of the Offerings (*id.* ¶ 3)—"carried out a plan which was intended to and did (a) deceive the investing public, including Plaintiffs and the Class; and (b) artificially drive down the price of ECD stock" (*id.* ¶ 56). The CACAC alleges that, while it was "predatory hedge funds" who actually conducted the massive short sales that decimated ECD's stock price,. the Credit Suisse Defendants orchestrated the Offerings, as outlined above, for the very purpose of creating an investment vehicle that would allow those hedge funds to make a windfall while sending the price of ECD stock into a downward spiral.

According to the CACAC, the Credit Suisse Defendants—who solicited and negotiated with interested investors prior to the Offerings—"knew in advance of the Offerings how hedge funds planned to exploit the financing scheme to make large sales of ECD stock." (*Id.* ¶ 41.) They misled investors by representing in the Share Lending Agreement, to which they were parties, and in the Prospectuses, which they "prepared and/or substantially contributed to" (*id.* ¶ 14), that they would use borrowed ECD shares only to facilitate investors' hedging of their investments in ECD's convertible notes. Then, in their capacity as lead underwriter of the Offerings and contrary to the representations made in the Share Lending Agreement and the Prospectuses, the Credit Suisse Defendants facilitated the market manipulation and destruction of ECD's stock price by lending out far more shares of common stock for short sales than was actually necessary for investors to "hedge" their positions in ECD's convertible notes. The actions of the Credit Suisse Defendants, who were allegedly "on both sides of the [O]fferings, simultaneously selling the stock and Notes to investors while soliciting hedge funds to make giant bets against the stock," allowed hedge funds to make "huge, coordinated" short sales of ECD stock. (*Id.* ¶ 5.)

The price of ECD stock then "predictably" collapsed in response (*id.* ¶ 45), sinking from approximately $72 per share on June 18, 2008 to less than $1 per share in February 2012. The "sharp decline" in the value of ECD stock hindered ECD's ability to secure further financing to run its business, and so "inhibited ECD's ability to continue operate." (*Id.* ¶ 46.) Ulti-

mately, in February 2012—allegedly as a result of the Credit Suisse Defendants' market manipulation and misrepresentations—ECD filed for bankruptcy protection, causing ECD shareholders to suffer tremendous losses, even as the Credit Suisse Defendants' hedge fund clients reaped enormous rewards.

## II. *CHOICE OF LAW*

Before deciding the Motion or the Credit Suisse Defendants' Request for Judicial Notice, the Court must determine which application of the law it must employ in doing so. As described above, the instant action originated in the United States District Court for the Northern District of California and was transferred to this Court pursuant to Section 1404(a). It is well settled that when a suit involving state-law claims is before a district court based on diversity jurisdiction, and is then transferred to a different venue pursuant to Section 1404(a), the transferee court must apply the state law of the transferor court; a transfer of venue under such circumstances " 'does not change the law applicable to a diversity case.' " *Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138, 154 n. 16 (2d Cir.2013) (*quoting Ferens v. John Deere Co.*, 494 U.S. 516, 530, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990)).

■ However, the Court has subject matter jurisdiction over the claims in the instant action because they arise out of substantive federal law, specifically, the Exchange Act and Rule 10b–5 promulgated thereunder. (*See* CACAC ¶¶ 18–19). Under such circumstances, the transferee court must apply its own interpretation of federal law in adjudicating the dispute. *See Ctr. Cadillac, Inc. v. Bank Leumi*

*Trust Co. of New York*, 808 F.Supp. 213, 224 (S.D.N.Y.1992) *aff'd*, 99 F.3d 401 (2d Cir.1995). When an action is transferred pursuant to Section 1404(a),

> [t]he weight of well-reasoned authority supports the application of the substantive federal law of the transferee court.... Federal courts are competent to decide issues of federal law and should not be placed in the awkward position of having to apply the federal law of another circuit when it conflicts with their own circuit's interpretation.

*Id. See also Menowitz v. Brown*, 991 F.2d 36, 40–41 (2d Cir.1993) ("[A] transferee federal court should apply its interpretations of federal law, not the constructions of federal law of the transferor circuit.").

Consequently, the Court will apply the Second Circuit's interpretation of the applicable federal law to the adjudication of the Motion and the Request for Judicial Notice.[2]

## III. *JUDICIAL NOTICE*

Because the Court's ruling on the Credit Suisse Defendants' Request for Judicial Notice affects the information available to the Court in ruling on the Motion, the Court will address the Request for Judicial Notice prior to examining the Motion. The Credit Suisse Defendants ask the Court to take judicial notice of eight public documents: (1) "[ECD]'s Prospectus Supplement for Convertible Senior Notes filed with the [SEC] on June 18, 2008 (referenced in the [CACAC] at ¶¶ 4–5, 38)"; (2) "ECD's Prospectus Supplement for Common Stock filed with the SEC on June 18, 2008 (referenced in the [CACAC] at ¶¶ 4–5, 3839)"; (3) "ECD's Form 10–K filed

---

**2.** Because the Motion was filed prior to the transfer of venue from the Northern District of California to this Court, the parties' briefs largely address the Ninth Circuit's interpretations of the law at issue. However, the Court finds that the Ninth and Second Circuits' interpretations of the relevant law are similar enough that no additional briefing is necessary.

with the SEC on August 27, 2009"; (4) "ECD's Form 10–K filed with the SEC on August 31, 2010"; (5) "ECD's Form 8–K filed with the SEC on August 31, 2010"; (6) "ECD's Form 10–K filed with the SEC on August 25, 2011"; (7) "ECD's Form 8–K filed with the SEC on August 25, 2011"; (8) "ECD's Form 8–K filed with the SEC on February 13, 2012." (Req. Jud. Not. at 1.)

 Under Rule 201(b) of the Federal Rules of Evidence, a court may take judicial notice of "a fact that is not subject to reasonable dispute because it ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *See Island Software & Computer Serv., Inc. v. Microsoft Corp.,* 413 F.3d 257, 261 (2d Cir.2005). Moreover, matters of which the Court takes judicial notice are not considered matters outside the pleadings; the Court may consider them when adjudicating a motion to dismiss without converting the motion to dismiss into a motion for summary judgment. *Staehr v. Hartford Fin. Servs. Grp., Inc.,* 547 F.3d 406, 426 (2d Cir.2008); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular ... matters of which a court may take judicial notice."). Additionally, in deciding a Rule 12(b)(6) motion to dismiss a complaint that contains a nondisclosure or misrepresentation claim alleging that "document[s] filed with the SEC failed to disclose certain facts," it is appropriate for the Court to take judicial notice of and consider those documents, as long as the Court considers them " 'only to determine what the documents stated,' " and " 'not to prove the truth of their contents.' " *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (*quoting Kramer v. Time Warner,* 937 F.2d 767, 774 (2d Cir.1991)).

Having been publicly filed with the SEC, these documents "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned" (Fed.R.Evid.201(b)) and "no serious question as to their authenticity can exist" (*Kramer,* 937 F.2d at 774).

 The case at hand involves a misrepresentation claim, and the documents of which the Credit Suisse Defendants seek judicial notice are public SEC filings discussed in the CACAC. It is therefore appropriate for the Court to take judicial notice of the requested documents and to consider them in adjudicating the Motion, examining the documents only to determine what statements they contain rather than to prove the truth of the documents' contents. Plaintiffs have been "put on notice by the [Credit Suisse] [D]efendants' proffer of the documents that the district court might consider them" (*Kramer,* 937 F.2d at 774), and have neither objected to the Court taking judicial notice of the documents nor contested their authenticity in any way. Accordingly, the Credit Suisse Defendants' Request for Judicial Notice is granted.

## IV. LEGAL STANDARD

### A. RULE 12(b)(6) MOTION TO DISMISS

The Motion argues that the CACAC should be dismissed because it fails to state a claim for which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (*quoting Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. The task of a court in ruling on a motion to dismiss is to "assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *In re Initial Pub. Offering Sec. Litig.*, 383 F.Supp.2d 566, 574 (S.D.N.Y.2005) (internal quotation marks omitted), *aff'd sub nom. Tenney v. Credit Suisse First Boston Corp.*, No. 05–3430–CV, 2006 WL 1423785 (2d Cir. May 19, 2006). The court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.2002).

However, plaintiffs claiming fraud, including securities fraud, must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) ("Rule 9(b)") by "stat[ing] with particularity the circumstances constituting fraud." Fed. R.Civ.P. 9(b); *see ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir.2007). A complaint alleging securities fraud must also meet the requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(b), which requires that a complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is based on information or belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.*

## B. THE EXCHANGE ACT

Plaintiffs assert two claims against the Credit Suisse Defendants: (1) misrepresentations or omissions of material fact and market manipulation in violation of Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder and (2) misrepresentations or omissions of material fact and a scheme to depress the price and induce the sale of ECD stock in violation of Section 9 of the Exchange Act. The Motion argues that Plaintiffs have failed to state a claim upon which relief may be granted because: (1) Plaintiffs have failed to allege that the Credit Suisse Defendants engaged in any market manipulation or made a false or misleading statement; (2) Plaintiffs have failed to allege that the Credit Suisse Defendants acted with scienter; and (3) Plaintiffs have failed to allege loss causation. The Court will limit its discussion of the legal standards, as well as its analysis of the merits of the Motion, to that which is relevant to the specific deficiencies alleged.

### 1. Section 10(b), Rule 10b–5, and Section 9

Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance...." 15 U.S.C. § 78j(b). Rule 10b–5, promulgated thereunder, provides that it is unlawful, in connection with the purchase or sale of any security, "(a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact ... or (c) [t]o engage in any act, practice, or course of business which operates ... as a fraud or deceit...." 17 C.F.R. § 240.10b–5. Section 10(b) operates as a "broad" prohibition against manipulation, whether in the form of false statements or market

manipulation. *United States v. Royer,* 549 F.3d 886, 900 (2d Cir.2008); *see ATSI,* 493 F.3d at 99.

Plaintiffs do not indicate in the CACAC the provisions of Section 9 out of which their claims arise. However, based upon the facts alleged, the Court will construe the CACAC to allege misrepresentations or omissions of material fact in violation of Section 9(a)(4), and a series of manipulative market transactions in violation of Section 9(a)(2). Section 9(a)(4) of the Exchange Act closely parallels Section 10(b), and makes it unlawful for any person selling or offering for sale or purchasing or offering to purchase a security

> to make ... any statement which was at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, and which that person knew or had reasonable ground to believe was so false or misleading.

15 U.S.C. § 78i(a)(4); *Panfil v. ACC Corp.,* 768 F.Supp. 54, 59 (W.D.N.Y.1991) *aff'd,* 952 F.2d 394 (2d Cir.1991); *Salvani ·v. ADVFN PLC,* 50 F.Supp.3d 459, 475–77 (S.D.N.Y.2014). Section 9(a)(2) of the Exchange Act prohibits the making of a "series of transactions in any security ... creating actual or apparent active trading in such security or raising or depressing the price of such securities, for the purpose of inducing the purchase or sale of such security by others." 15 U.S.C. § 78i(a)(2); *Cohen v. Stevanovich,* 722 F.Supp.2d 416, 424 (S.D.N.Y.2010). "The central purpose of [S]ection 9(a) is not to prohibit market transactions which may raise or lower the price of securities, but to keep an open and free market where the natural forces of supply and demand determine a security's price." *S.E.C. v. Malenfant,* 784 F.Supp. 141, 144 (S.D.N.Y.1992) *(quoting Trane Co. v. O'Connor Securities,* 561 F.Supp. 301, 304 (S.D.N.Y.1983) *(citing Chris–Craft Industries, Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 383 (2d Cir.1973), *cert. denied,* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973))).

### 2. *Market Manipulation*

■■■ A claim of market manipulation under Section 10(b) and Rule 10b–5 "requires a plaintiff to allege (1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *ATSI,* 493 F.3d at 101. "In order for market activity to be manipulative, that conduct must involve misrepresentation or nondisclosure." *Wilson v. Merrill Lynch & Co.,* 671 F.3d 120, 130 (2d Cir.2011). However, allegations of misrepresentations or omissions alone cannot support a claim of market manipulation. *ATSI,* 493 F.3d at 101. Rather, there must be "wash sales, matched orders, rigged prices, or some other manipulative act intended to mislead investors by artificially affecting market activity." *Cohen,* 722 F.Supp.2d at 424 *(citing Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 476, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977)). Essentially, a claim of market manipulation

> require[s] a showing that an alleged manipulator engaged in market activity aimed at deceiving investors as to how other market participants have valued a security.... The gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators.

*Wilson,* 671 F.3d at 130 (internal quotation marks and citations omitted).

■■■ In order to satisfy the heightened pleading standards for fraud, a complaint alleging market manipulation must

"plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants." *ATSI*, 493 F.3d at 102.

A claim of manipulation, however, can involve facts solely within the defendant's knowledge; therefore, at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim. *See Internet Law Library[, Inc. v. Southridge Capital Mgmt., LLC]*, 223 F.Supp.2d [474,] 486 [ (S.D.N.Y.2002) ]; *[S.E.C. v.] U.S. Envtl.*, 82 F.Supp.2d [237,] 240 [ (S.D.N.Y.2000) ]; *cf. Rombach [v. Chang]*, 355 F.3d 164,] 175 n. 10 [ (2d Cir.2004) ] (relaxing the standard where information was likely to be in the exclusive control of the defendants and analysts).

*Id.* Accordingly, a plaintiff has adequately pleaded market manipulation when

the complaint sets forth, to the extent possible, what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue.

*Id.* (internal quotation marks omitted).

■ To assert a claim under Section 9(a)(2), a plaintiff must show " '(1) a series of transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security, (2) carried out with scienter and (3) for the purpose of inducing the security's sale or purchase by others ...' " *Malenfant*, 784 F.Supp. at 144 (*quoting Chemetron Corp. v. Bus. Funds, Inc.*, 682 F.2d 1149, 1164 (5th Cir.1982), *vacated on other grounds*, 460 U.S. 1007, 103 S.Ct. 1245, 75 L.Ed.2d 476 (1983), *on remand*, 718 F.2d 725, 728 (5th Cir.1983) (footnotes omitted) (*citing Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787 (2d Cir.1969), *cert.*

*denied*, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970))).

### 3. *Misstatements or Omissions of Material Fact*

■ To state a claim under Section 10b and Rule 10b–5 for misrepresentation, a plaintiff must allege " '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.' " *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta*, 552 U.S. 148, 157, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008) (*quoted by Fezzani v. Bear, Stearns & Co. Inc.*, 716 F.3d 18, 27 (2d Cir.2013)); *see also ATSI*, 493 F.3d at 105.

■ In order to satisfy Rule 9(b)'s heightened pleading requirements, "[a] securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI*, 493 F.3d at 99. Furthermore, in accordance with the PSLRA, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *ATSI*, 493 F.3d at 99 (internal quotation marks removed). An omission is actionable "only when the [defendant] is subject to a duty to disclose the omitted facts." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir.1993). Although "Rule 10b–5 imposes no duty to disclose all material, nonpublic information, once a party chooses to speak, it has

a 'duty to be both accurate and complete.'" *Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.,* 753 F.Supp.2d 166, 180 (S.D.N.Y.2010) (*quoting Caiola v. Citibank, N.A., N.Y.,* 295 F.3d 312, 331 (2d Cir.2002)).

■ Section 9(a)(4) "closely parallels" Section 10(b) and Rule 10b–5, though "at least one court in this Circuit has noted that Section 9(a)(4) creates a higher burden of proof than Section 10(b)." *Salvani,* 50 F.Supp.3d at 477 (*citing Panfil,* 768 F.Supp. at 59) (*quoting Chemetron,* 682 F.2d at 1162). A claim of misstatements under Section 9(a)(4) " 'requires a(1) misstatement or omission (2) of material fact (3) made with scienter (4) for the purpose of inducing a sale or purchase of a security (5) on which the plaintiff relied (6) that affected plaintiff's purchase or selling price.'" *Salvani,* 50 F.Supp.3d at 476 (*quoting Chemetron,* 682 F.2d at 1161–62 (footnotes omitted)).

**4. Scienter**

■ Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud" (*Tellabs,* 551 U.S. at 319, 127 S.Ct. 2499 (internal quotation marks omitted)), and is a required element of fraud, whether accomplished by misrepresentation or market manipulation, and whether in violation of Section 10(b), Rule 10b–5, Section 9(a)(2), or Section 9(a)(4) (*see, e.g., ATSI,* 493 F.3d at 101, 105; *Salvani,* 50 F.Supp.3d at 476–77; *Malenfant,* 784 F.Supp. at 144). In order to plead a "strong inference" of scienter, plaintiffs must allege with particularity either (a) "facts to show that the defendant had both motive and opportunity to commit fraud," or (b) "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit v. Eichler,* 264 F.3d 131, 138 (2d Cir.2001) (internal quotation marks omitted). A strong inference of scienter may arise when a plaintiff pleads that a defendant: "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford,* 794 F.3d 297, 306 (2d Cir.2015) (*quoting ECA,* 553 F.3d at 199 (*quoting Novak,* 216 F.3d at 311)). *See also S. Cherry St., LLC v. Hennessee Grp. LLC,* 573 F.3d 98, 109–10 (2d Cir.2009). In assessing whether a plaintiff has pleaded scienter, courts consider whether all of the facts, taken together, give rise to an inference of scienter that is "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs,* 551 U.S. at 314, 127 S.Ct. 2499.

■ A complaint has sufficiently alleged "motive and opportunity to commit fraud" if it pleads facts showing that the defendant "benefitted in some concrete and personal way from the purported fraud." *Novak v. Kasaks,* 216 F.3d 300, 307–08 (2d Cir.2000). "Motives that are common to most corporate officers ... do not constitute 'motive' for the purpose[ ]" of establishing scienter. *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,* 553 F.3d 187, 198 (2d Cir.2009). The opportunity to commit fraud is generally assumed where the defendant is a corporation or corporate officer. *See, e.g., In re AstraZeneca Sec. Litig.,* 559 F.Supp.2d 453, 468 (S.D.N.Y. 2008); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,* 446 F.Supp.2d 163, 181 (S.D.N.Y. 2006) ("Regarding the 'opportunity' prong, courts often assume that corporations, corporate officers, and corporate directors would have the opportunity to commit fraud if they so desired.").

■ A plaintiff pleading the "conscious misbehavior or recklessness" theory of

scienter must allege conduct which is "highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Kalnit*, 264 F.3d at 142 (internal quotation marks omitted). Specifically, a complaint sufficiently pleads scienter where it alleges defendants had " 'knowledge of facts or access to information contradicting their public statements.' " *Id.* (*quoting Novak*, 216 F.3d at 308).

### 5. *Loss Causation*

 A plaintiff claiming securities fraud under the Exchange Act—regardless of whether the plaintiff claims misrepresentations or market manipulation, and whether the claims arise out of Section 10(b) and Rule 10b–5 or Section 9(a)— must "adequately allege and prove the traditional elements of causation and loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005); *see also, e.g., ATSI*, 493 F.3d at 106; *Cohen*, 722 F.Supp.2d at 431 (*citing Fezzani v. Bear, Stearns & Co.*, 384 F.Supp.2d 618, 637 (S.D.N.Y.2004) (Under Section 9(a), the alleged manipulative act must have "affected plaintiff's purchase or selling price.") (internal quotation marks omitted)). Loss causation is " 'the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.' " *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir.2005) (*quoting Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d

Cir.2003)). In the case of a misstatement claim, a plaintiff must plead that "the loss [was] foreseeable and that the loss [was] caused by the materialization of the concealed risk." *Lentell*, 396 F.3d at 173.

In the wake of *Dura*, the Circuit Courts have split over whether loss causation is subject to PSLRA's heightened pleading standard, and the Second Circuit has explicitly left the question unresolved. *See Acticon AG v. China N.E. Petroleum Holdings Ltd.*, 692 F.3d 34, 38 (2d Cir. 2012). However, courts in this District have historically evaluated loss causation under the notice pleading standard of Rule 8 of the Federal Rules of Civil Procedure ("Rule 8") (*see, e.g., In re Citigroup Inc. Sec. Litig.*, 753 F.Supp.2d 206, 234 (S.D.N.Y.2010) ("Loss causation need not be pleaded with particularity.")), and have continued to use the notice pleading standard after *Acticon* (*see, e.g., In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F.Supp.3d 278, 292–93 (S.D.N.Y.2014)).

 In keeping with the prevailing practice of this District, a short and plain statement that provides the defendant with notice of the loss and its causal connection to the alleged misconduct is therefore sufficient to assert loss causation; pleading the elements with particularity is not required.

## V. DISCUSSION

### A. ACTS OF MARKET MANIPULATION

The Credit Suisse Defendants assert a two-pronged argument with regard to the Plaintiffs' claims of market manipulation under Section 10(b) and Rule 10b–5.[3]

---

**3.** Below a broad heading titled "Plaintiffs Fail To State A Claim Under Section 10(b) or Section 9" (Mot. 6.), the Motion contends that the CACAC fails to allege that there was any market manipulation of ECD stock, and also fails to allege that the Credit Suisse Defendants participated in any market manipu-

lation of ECD stock (Mot. 6–10). However, the Motion then argues exclusively that Plaintiffs have not shown that the Credit Suisse Defendants participated in manipulative activity of ECD stock in violation of Section 10(b) and Rule 10b–5—citing almost entirely to case law applicable only to those sections—

First, the Credit Suisse Defendants posit that the CACAC fails to plead facts demonstrating the existence of any market manipulation of ECD stock. (Mot. 6–9.) Second, the Credit Suisse Defendants argue that Plaintiffs have failed to allege facts supporting the inference that the Credit Suisse Defendants participated in any market manipulation of ECD stock, even if such manipulation did occur. (Mot. 9–10.)

The Court finds that Plaintiffs have pleaded enough facts to support a reasonable inference that market manipulation of ECD stock occurred, and that the Credit Suisse Defendants participated in it.

### 1. Manipulative Acts Under Section 10(b) and Rule 10b–5

As discussed above in Section IV(B)(2) of this opinion, a claim of market manipulation under Section 10(b) and Rule 10b–5 promulgated thereunder requires that a plaintiff plead "manipulative acts." *See, e.g., ATSI,* 493 F.3d at 101. The Credit Suisse Defendants argue that Plaintiffs have failed to allege such manipulative acts.

#### a. ATSI and Cohen

The Motion, relying heavily on *ATSI* and *Cohen,* claims that the CACAC fails to allege facts giving rise to an inference of manipulative activity. The Motion argues that in the case at hand—as in ATSI—Plaintiffs have based their allegations of market manipulation on "high-volume selling of ... stock with coinciding drops in the stock price" and· "trading patterns," and that such allegations are merely "speculative inferences" and insufficient to state a claim. (Mot. 7 (*quoting ATSI,* 493 F.3d at 102–03).) The Credit Suisse Defendants draw parallels between Plaintiffs in the instant action and the *ATSI* plaintiffs, who failed to "particularly allege what the defendants did—beyond simply mentioning common types of manipulative activity—or state how this affected the market in ATSI's stock." (Mot. 7–8; *ATSI,* 493 F.3d at 104.) The Credit Suisse Defendants further argue that, like the plaintiffs in *Cohen,* Plaintiffs "fail to allege even the most basic details of the ... purported illegal short selling," and that such groundless allegations are the type of claims prohibited by *Twombly.* (Mot. 8; *Cohen,* 722 F.Supp.2d at 432.)

However, Plaintiffs are correct that the case at hand is clearly distinguishable from *ATSI* and *Cohen.* (*See* Opp'n 12–13.) (In *ATSI,* the plaintiffs alleged that the defendants had manipulated the price of ATSI stock by engaging in "death spiral financing," which was defined as making high-volume short sales and then converting convertible securities into common stock to cover their short positions). *ATSI,* 493 F.3d at 96. The *ATSI* plaintiffs attempted to support their allegations by claiming. that the *ATSI* defendants had participated in such schemes in the past, as evidenced by "searches in the SEC's Edgar database[, which] reveal[ed] that of the 38 companies that reported the Levinson Defendants as investors, 30 experienced stock price declines indicative of a 'death spiral' financing scheme." *ATSI,* 493 F.3d at 97. The *ATSI* plaintiffs also did not allege any specific acts of short selling or other transactions, but rather argued that the occurrence of high-volume selling and a drop in ATSI stock prices indicated that short sell-

---

and with no separate discussion of the legal standard under which a claim of market manipulation of ECD stock in violation of Section 9 should be analyzed, or assertions that Plaintiffs have failed to meet such a standard. The Court will therefore construe the Motion as arguing only that Plaintiffs have failed to allege manipulative activity under Section 10(b) and Rule 10b–5, and will not discuss the standards applicable to analyzing a claim—or the sufficiency of the CACAC's allegations under—Section 9.

ing—as part of "death spiral financing"— had taken place. *Id.* at 103. The ATSI plaintiffs then "narrow[ed] the list of potential culprits to the defendants because ATSI's major shareholders said that they were not selling stock, leaving only the defendants with large enough blocks of shares to trade at the observed volumes." *Id.*

The *Cohen* plaintiffs' pleadings suffered from similar weaknesses. The plaintiffs in *Cohen* alleged that the defendants had engaged in "naked short selling," a practice that involves executing short sales of stock without first borrowing the stock or ensuring that the stock can be borrowed to settle the short sale. *Cohen,* 722 F.Supp.2d at 421. However, the *Cohen* plaintiffs could not point to any specific short sales made by any particular defendants, and in support of the occurrence of "naked short sales" only alleged that a particular seller was unable to deliver a security on a settlement date. *Id.* at 421– 24.

In contrast, in the case at hand, Plaintiffs have alleged how many shares were made available to the Credit Suisse Defendants through the Offerings and how many shares the Credit Suisse Defendants lent out for short sales, and these allegations are based on data rather than on circumstantial evidence. (*See, e.g.,* CACAC ¶ 42.) Plaintiffs have also alleged the number of ECD convertible notes sold, demonstrating that investors were shorting on average more than 10 shares of ECD common stock for each convertible note. (*Id.* ¶ 43.) The CACAC explains in some detail how the Credit Suisse Defendants allegedly structured the Offerings to allow for manipulation (*id.* ¶¶ 29–36) and how the price of ECD stock then plummeted as ECD's short volume steadily rose after the Offerings (*id.* ¶ 45). Plaintiffs' allegations as to how the alleged manipulative scheme operated are therefore far less speculative than

the allegations made by the plaintiffs in *ATSI* and *Cohen.*

### b. *"Something More"*

The Motion further contends that Plaintiffs have merely alleged high-volume short selling, and that "courts have recognized that there is nothing 'manipulative' about short selling, even in large volumes." (Mot. 7 (*citing ATSI,* 493 F.3d at 103).) This argument mischaracterizes both ATSI and the CACAC. The ATSI court stated that

> short selling—even in high volumes—is not, *by itself,* manipulative . . . To be actionable as a manipulative act, short selling must be willfully combined with something more to create a false impression of how market participants value a security. Similarly, purchasing a floorless convertible security is *not, by itself* or when coupled with short selling, inherently manipulative.

*ATSI,* 493 F.3d at 101 (internal citations removed) (emphasis added). Consistent with *ATSI,* other courts in this district have found that open-market transactions that are not, in and of themselves, manipulative or illegal, may constitute manipulative activity within the meaning of Section 10(b) when coupled with manipulative intent. *See, e.g., S.E.C. v. Masri,* 523 F.Supp.2d 361, 372 (S.D.N.Y.2007) ("The Court concludes . . . that if an investor conducts an open-market transaction with the intent of artificially affecting the price of the security, and not for any legitimate economic reason, it can constitute market manipulation."); *ATSI,* 493 F.3d at 102 ("[I]n some cases scienter is the only factor that distinguishes legitimate trading from improper manipulation.").

In the case at hand, Plaintiffs have clearly alleged that short selling was "willfully combined with something more" as required by *ATSI* and Rule 10(b).

Plaintiffs allege that the Credit Suisse Defendants were the "architect[s] and key participant[s] in [a] manipulative scheme." (CACAC ¶ 5.) Plaintiffs further allege that the Credit Suisse Defendants orchestrated the Offerings for the purpose of allowing their hedge fund clients to make huge profits while sinking the price of ECD stock, hid this purpose from ECD and its investors, and then intentionally lent out far more shares of common stock for short sales than was necessary for investors to "hedge" their positions in ECD's convertible notes, facilitating the market manipulation—and depression—of ECD's stock price. (*See, e.g., Id.* ¶¶ 5, 41, 45, 56.) Plaintiffs have therefore alleged not only high-volume short selling, but also a coordinated scheme engineered by the Credit Suisse Defendants to use short selling to manipulate the price of ECD stock, "creat[ing] a false impression of how market participants value a security." *ATSI,* 493 F.3d at 101.

It bears consideration that many of the allegations in the CACAC regarding how the alleged scheme actually operated— how, for example, the hedge funds worked together to engage in "coordinated" short sales (CACAC ¶¶ 5, 8)—and from which manipulative intent can be inferred, do not contain extensive factual detail (*see, e.g., id.* ¶ 5). Moreover, Plaintffs' allegations of manipulation must meet the heightened pleading requirements of Rule 9(b)—Plaintiffs must "state with particularity the circumstances constituting fraud." Fed. R.Civ.P. 9(b); *ATSI,* 493 F.3d at 101.

However, where factual detail is absent from the CACAC, it is important to note that a manipulation claim need not be pleaded to the same degree of specificity as a misrepresentation claim when relevant information is likely to be solely within the defendant's knowledge. *ATSI,* 493 F.3d at 102. Undoubtedly, the private communications between the Credit Suisse Defendants and their clients as they allegedly collaborated carry out an unlawful scheme to manipulate the price of ECD stock fall squarely in the purview of information that is likely to be in the exclusive control of the Credit Suisse Defendants and their clients, and that may be resolved only through discovery, making dismissal of the action inappropriate at this stage of the proceedings.

### c. *"Legitimate" Hedging*

The Motion also criticizes the CACAC for "hing[ing] entirely on the fact that the volume of short sales after the Offerings exceeded what Plaintiffs' claim was 'necessary' for 'legitimate' hedging activity." (Mot. 8.) The Motion points out that the CACAC cites only to a single source[4] for its contention that the appropriate "hedge ratio" under circumstances such as those alleged in the case at hand would have been less than 50 percent of the number of shares the ECD convertible notes could be converted into, and the cited source is "a knowledge-based document prepared by an asset management firm located in Switzerland, and serving primarily clients in the German-speaking region of Europe. The Motion further avers that "[w]hy, or how, this European-based asset management firm serves as any authority whatsoever for what a 'legitimate hedging' strategy would be is a mystery—that is unexplained by Plaintiffs [sic] conclusory allegations on such." (Mot. 8 n. 3 (*citing* CACAC ¶ 26).)

It is true that many of Plaintiffs' allegations regarding manipulation are heavily dependent on what they claim the term

4. The CACAC cites to Thoma, Beat, "Convertible Bonds—Strategies and Concepts," Fisch Asset Management (2013). (CACAC ¶ 26.)

"hedging" means in the finance world. Essentially, Plaintiffs argue that "hedging" is defined as a market neutral strategy, the employment of such—in the context of the facts at issue—would have resulted in investors shorting far fewer shares per convertible note than they ultimately did. Plaintiffs argue that the Credit Suisse Defendants covenanted and represented that they would use the ECD shares only to facilitate hedging, all the while intending to—and then actually—lending out far more stock for short sales to investors than would be required for hedging, allowing their investors to engage in massive short sales and manipulate the price of ECD stock. If the term "hedging" does not in fact refer to the specific, market neutral strategy alleged by Plaintiffs, and if the strategies employed by the Credit Suisse Defendants' hedge fund clients can appropriately be characterized as "hedging," then the Credit Suisse Defendants' "scheme" entailed little misrepresentation. *See Wilson*, 671 F.3d at 130 ("In order for market activity to be manipulative, that conduct must involve misrepresentation or nondisclosure.")

In questioning the definition of "hedging" and "hedge ratio" used in the CACAC, however, the Credit Suisse Defendants have merely raised a factual dispute inappropriate for resolution at the pleading stage, before the development of a fuller factual record of discovery, including the opinion of other experts whose testimony may shed better light on these complex economic and industry practice issues. Resolving a disagreement over the interpretation of terminology instrumental to the alleged manipulative scheme—as well as the alleged misstatements and omissions—would require "assay[ing] the weight of the evidence," which is not permitted when adjudicating a motion to dismiss. *In re Initial Pub. Offering Sec. Litig.*, 383 F.Supp.2d at 574.

The Court therefore finds that the Plaintiffs have alleged enough facts to support a reasonable inference of the occurrence of manipulative acts of ECD stock within the meaning of Section 10(b) and Rule 10b–5 and have satisfied the heightened pleading standards of Rule 9(b).

### 2. The Credit Suisse Defendants' Participation in Manipulative Acts Under Section 10(b) and Rule 10b–5

The Motion next asserts that even if there was market manipulation of ECD's stock, the CACAC has not alleged facts supporting an inference that the Credit Suisse Defendants actually participated in such manipulation. The Motion points out that the CACAC does not state who actually engaged in the "manipulative" short sales; the "predatory hedge funds" are unnamed and unspecified. (Mot. 10.) Furthermore, the Credit Suisse Defendants assert that Plaintiffs have not pleaded facts showing that Credit Suisse provided shares to any of the "predatory hedge funds" in particular. (*Id.*) From the allegations in the CACAC, the Motion argues, "there is no basis to infer that Credit Suisse did anything other than what the Prospectuses said Credit Suisse would do. That can hardly be deemed 'manipulative' or 'deceptive' act in furtherance of some 'scheme' . . ." (*Id.*)

The Credit Suisse Defendants are correct that the CACAC does not specifically name any of the "predatory hedge funds" (CACAC ¶ 5) or provide evidence of the specific transactions in which the Credit Suisse Defendants allegedly lent shares to those predatory hedge funds in particular. (*See generally* CACAC.) However, Plaintiffs have alleged that Does 1 through 100, named as codefendants in this action with Credit Suisse, "are [the] hedge funds that engaged in [the] short selling alleged" in

the Complaint. (*Id.* ¶ 17.) Plaintiffs have indicated that they are "unaware of the true names and capacities" of these defendants but "will seek leave to amend this Complaint when such names are ascertained." (*Id.*)

Furthermore, the "predatory hedge funds" are not moving to dismiss the suit; the Credit Suisse Defendants are, and Plaintiffs have pleaded sufficient facts to show the Credit Suisse Defendants' participation in the alleged manipulative scheme. As discussed above in Section V(B)(1)(a) of this Opinion, Plaintiffs have alleged how many shares were made available to the Credit Suisse Defendants through the Offerings, how many shares the Credit Suisse Defendants lent out for short sales, and the number of convertible notes sold. (*See, e.g., id.* ¶ 42–43.) Plaintiffs have also alleged that the Credit Suisse Defendants structured the Offerings expressly for the purpose of facilitating the market manipulation of the price of ECD stock and hid this purpose from ECD and its investors. (*Id.* ¶¶ 29–36.) Plaintiffs further allege that the Credit Suisse Defendants then loaned far more shares to investors than necessary for "legitimate hedging," allowing their hedge fund clients to engage in rampant, coordinated short sales of ECD stock, manipulating and depressing the price of ECD's stock. (*Id.* ¶ 43.)

Certainly, while providing a great deal of detail about the perverse incentives offered to investors through the Offerings (*Id.* ¶ 29–36) and demonstrating how the structure of the Offerings "created a perfect 'heads I win, tails you lose' investment vehicle [for the Credit Suisse Defendants] to sell to hedge funds" (*Id.* ¶ 31.), the facts Plaintiffs allege in support of the inference that the Credit Suisse Defendants were the "architect[s]" of the scheme—that the Credit Suisse Defendants orchestrated the Offerings with the purpose of facilitating a manipulative scheme to decimate the price

of ECD stock and then lent excessive numbers of shares to their investor clients in service of the scheme—are far more limited. (*Id.* ¶ 5; *also see generally* CACAC; *supra* section IV(B)(1)(b).) The CACAC's main factual allegation in this regard is that the Credit Suisse Defendants "knew in advance of the Offerings how hedge funds planned to exploit the financing scheme to make large sales of ECD stock" because the Credit Suisse Defendants solicited indications of interest and established a clearing price with potential investors prior to the Offerings. (CACAC ¶ 41 (*quoting* the Common Stock Prospectus).) Plaintiffs have not alleged specific conversations, names, or dates as to when or how exactly the scheme was engineered and carried out by Credit Suisse.

However, it is once again important to note that a manipulation claim need not be pleaded to the same degree of specificity as a misrepresentation claim when relevant information is likely to be solely within the defendant's knowledge. *ATSI,* 493 F.3d at 102. The private communications in which the Credit Suisse Defendants allegedly orchestrated a manipulative scheme and collaborated with their hedge funds clients to manipulate the price of ECD stock certainly constitute information likely to be in the exclusive control of the Credit Suisse Defendants at this stage of the proceedings.

 Weighing all inferences in Plaintiffs' favor, as the Court is required to do in adjudicating a motion to dismiss, Plaintiffs have sufficiently pleaded that the Credit Suisse Defendants engaged in acts of market manipulation of ECD stock. Plaintiffs have pleaded with enough particularity, and "to the extent possible," the nature (large-scale coordinated short sales), purpose (to drive down the price of ECD stock), and effect of the fraudulent conduct (the depression of the price of

ECD's stock price) and the roles of the defendants (the "architect[s]" of the scheme—the designer of the Offerings and, as underwriter of the Offerings, the lender of the shares to the investors who engaged in the short selling). *See ATSI*, 493 F.3d at 102.

Accordingly, the Court finds that the CACAC has alleged enough facts to give rise to a reasonable inference that the Credit Suisse Defendants participated in the alleged acts of market manipulation of ECD stock, and has pleaded this element of market manipulation under Section 10(b) and Rule 10b–5 with enough particularity to satisfy the heightened pleading requirements of Rule 9(b).

## B. MISSTATEMENTS OR OMISSIONS OF MATERIAL FACT

The Credit Suisse Defendants assert a similar two-pronged argument with regard to the Plaintiffs' false statement claims under Section 10(b) and Rule 10b–5.[5] First, the Credit Suisse Defendants posit that the CACAC fails to plead facts demonstrating that any misleading statements were actually made. Second, the Credit Suisse Defendants argue that "[e]ven assuming, *arguendo*, that false statements were made in the Prospectuses (which they were not), there is no basis for holding Credit Suisse liable for any such statements because Plaintiffs have failed to allege that [the] Credit Suisse Defendants 'made' the challenged statements." (Mot. 11.)

The Court finds that Plaintiffs have sufficiently alleged facts supporting a reasonable inference that misstatements · or omissions were made, and have sufficiently alleged facts supporting attribution of the allegedly misleading statements in the Share Lending Agreement to the Credit Suisse Defendants, but have failed to allege facts supporting the attribution of any statements in the Prospectuses to the Credit Suisse Defendants.

### 1. The Existence of Misleading Statements Under Section 10(b) and Rule 10b–5

As discussed above in Section IV(B)(3), a claim of misrepresentation or omissions under Section 10(b) and Rule 10b–5 promulgated thereunder requires that a plaintiff plead a "material misrepresentation or omission by the defendant." *Stoneridge*, 552 U.S. at 157, 128 S.Ct. 761. The Credit Suisse Defendants argue that the language identified by Plaintiffs as false or misleading is in fact neither. (Mot. 10.) Below the heading "Credit Suisse Misled ECD Investors Concerning the Purpose, Nature and Effect of the Financing Scheme It Had Implemented," the CACAC alleges that

The Prospectuses falsely represented to ECD investors (as Credit Suisse falsely represented to ECD) that the purpose of the simultaneous Stock and Convertible Note Offerings was only to allow Convertible Note investors to 'hedge' their investments in the Convertible Notes.

---

**5.** Below a broad heading titled "Plaintiffs Fail To State A Claim Under Section 10(b) or Section 9" (Mot. 6.), the Motion contends that the CACAC fails to allege that the Credit Suisse Defendants made any misleading statements (Mot. 10–12). However, similar to the *Motion's* treatment of its arguments regarding market manipulation, in content the Motion argues exclusively that Plaintiffs have not alleged misleading statements in violation of Section 10(b) and Rule 10b–5—citing to case law applicable only to those sections—and

with no separate discussion of the legal standard under which a claim of misleading statements in violation of Section 9 should be analyzed, or assertions that Plaintiffs have failed to meet such a standard. The Court will therefore construe the Motion as arguing only that Plaintiffs have failed to allege misleading statements under Section 10(b) and Rule 10b–5, and will not discuss the standards applicable to analyzing such a claim— or the sufficiency of the CACAC's allegations under—Section 9.

(CACAC ¶ 38.) Specifically, the CACAC then points to language in the Convertible Note Prospectus stating that an affiliate of the underwriter

has agreed to use the borrowed shares to facilitate the establishment by investors in the notes, and certain other of our securities, of hedge positions in such securities.

(*Id.*). The CACAC further points to a section of the Common Stock Prospectus stating

We will not receive any proceeds from the sale of the borrowed shares in this offering, but we will receive a nominal lending fee of $0.01 per share from CSI for the use of these shares. CSI will receive all the proceeds from the sale of the borrowed shares, and it has agreed to use the borrowed shares to facilitate privately negotiated transactions or short sales by which investors hedge their investments in the notes.

(*Id.* ¶ 39.) Additionally, in a different section of the CACAC—below the heading "Credit Suisse Misleads Energy Conversion Into a Financing Scheme That Was Secretly Designed By Credit Suisse and Its Client Hedge Funds to Allow for Rampant Manipulation of ECD Stock"— Plaintiffs quote a section of the Share Lending Agreement providing that the Credit Suisse Defendants would use the ECD stock

solely for the purpose of directly or indirectly (y) facilitating the sale and the hedging of the Convertible Notes by the holders thereof or, (z) with the prior written consent of the Lender, facilitating the sale and the hedging of any additional convertible securities which the Lender may issue from time to time by the holders thereof.

(*Id.* ¶ 25.) The CACAC asserts that these statements are "entirely" false and misleading because they failed to disclose

(i) that Credit Suisse had designed the Offerings to allow hedge funds to make massive negative bets against ECD stock without the risks normally associated with short sales, (ii) that Credit Suisse was on both sides of the offerings, simultaneously selling the stock and Notes to investors while soliciting hedge funds to make giant bets against the stock, (iii) that Credit Suisse knew from its solicitation conversations that hedge funds intended to and would make huge bets against ECD stock, not merely place short sales to "hedge" against downside risk on the Convertible Notes, (iv) that these huge negative bets would act as an anchor on the price of ECD stock, dragging it inexorably downward to the detriment of ECD shareholders, and (v) that the downward movement of ECD's stock price would not be the result of market forces but the inevitable result of the market manipulation perpetrated by Credit Suisse and its client hedge funds.

(*Id.* ¶ 40.)

a. *Accuracy and Disclosure*

The Credit Suisse Defendants argue that these statements are not misleading or false because even the facts pleaded by Plaintiffs support the conclusion that the Credit Suisse Defendants did exactly what these statements describe. (Mot. 11.) The Credit Suisse Defendants assert that they did use borrowed shares from ECD to facilitate transactions in which investors could hedge their investments in the Convertible Notes. (*Id.*) The Motion points out that the CACAC actually acknowledges that at least some investors in the Convertible Notes were small investors or companies who would not have participated in the manipulative scheme. (*See id.;* CACAC ¶ 14.) The Credit Suisse Defendants claim that rather than misstate, omit, or misrepresent the Credit Suisse

Defendants' actions, the Prospectuses all offer true statements and descriptions of the Credit Suisse Defendants' actions with regard to the Offerings.

The Credit Suisse Defendants are correct that much of the structure of "scheme" described by Plaintiffs is readily disclosed by the Prospectuses. For example, the two factors that Plaintiffs claim made the Offerings into "a perfect 'heads I win, tails you lose' investment vehicle [for the Credit Suisse Defendants] to sell to hedge funds" (CACAC ¶ 31.)—that the sale of convertible notes was coupled with the sale of common stock in order to facilitate hedging, and that the borrowing costs were all but eliminated because the Credit Suisse Defendants agreed to lend ECD stock to investors to short for a "nominal fee" of only one cent, far below market rates—were all clearly divulged in the Prospectuses. (*See, e.g.,* Declaration of Allison S. Davidson, Ex. 2, Common Stock Prospectus ("Common Stock Prospectus"), No. 55–2, at S–7, S–26, S–35, S–36.) Both of the Prospectuses also discuss the risks of the Offerings, cautioning that the price of ECD stock could fall following the Offerings. For example, the Common Stock Prospectus discusses risk in at least two places. On page S–22, it states:

> The effect of the issuance of our shares of common stock in this offering pursuant to the share lending agreement, which issuance is being made to facilitate sales of our common stock in short sale transactions by purchasers of certain of our securities, may be to lower the market price of our common stock.

Later, on page S–36, the Common Stock Prospectus reads:

> The existence of the share lending agreements and the short positions established in connection with the sale of the notes and potentially certain of our other securities could have the effect of causing the market price of our common

stock to be lower over the term of the share lending agreement than it would have been had we not entered into the agreement").

(*Cf.* Declaration of Allison S. Davidson, Ex. 1, Convertible Notes Prospectus ("Convertible Notes Prospectus"), No. 551, at S–28.)

■■■ However, with regard to the disclosure of risk in the Prospectuses, Plaintiffs are correct that "[i]t is black letter law that the disclosure of a mere possibility of a problem does not absolve defendants who failed to disclose that the problem was actually occurring, because investors would treat a mere possibility different [sic] from an existing problem." (Opp'n 15.) *See Rombach,* 355 F.3d at 173 ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.") (*citing In re Prudential Secs. Inc. P'ships Litig.,* 930 F.Supp. 68, 72 (S.D.N.Y.1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.")). Thus, if the Credit Suisse Defendants knew that the Offerings would certainly cause a massive drop in the price of ECD stock, but merely warned investors that the Offerings "might" cause the price to drop, such warnings would still constitute misstatements or omissions. Whether the Prospectuses disclosed enough risk to insulate the makers of the documents from liability based on a claim of misrepresentation or omission therefore raises a factual issue for trial.

Additionally, whether or not the identified statements can fairly be characterized as misstatements depends at least in part upon what the term "hedging" really

means. As discussed above in *supra* Section V(A)(1)(c), if Plaintiffs' definition of "hedging" is accurate, the statements are likely to be misstatements or omissions, whereas if the Credit Suisse Defendants' alleged activities following the offering can properly be described as "hedging," the statements in question are less likely to constitute misstatements or omissions within the meaning of the law. However, as also discussed above, whether Plaintiffs' contentions as to the meaning of the term "hedging" are correct is also a question of fact to be adjudicated by the fact finder.

b. *False When Made*

The Motion argues that Plaintiffs have not met their pleading burden with regard to their misstatements claims because Plaintiffs make merely a "series of conclusions" in asserting that the Credit Suisse Defendants "knew that the hedge funds would not be engaging in a 'legitimate hedging strategy' (according to Plaintiffs), thus rendering the Prospectuses' statements false." (Mot. 11.) The Motion maintains that these conclusions are "not sufficiently particularized and fail[ ] to show that the challenged statements were materially false or misleading when made." (Mot. 11.)

 The Credit Suisse Defendants are correct that Plaintiffs must show that the challenged statements were false when made in order to demonstrate the existence of misstatements under Section 10(b) and Rule 10b–5. *See ATSI,* 493 F.3d at 105 ("While the failure to carry out a promise in connection with a securities transaction might constitute breach of contract, it 'does not constitute fraud unless, when the promise was made, the defendant secretly intended not to perform or knew that he could not perform.' ") (*quoting Gurary v. Winehouse,* 190 F.3d 37, 44 (2d Cir.1999)). Moreover, "[j]ust because a corporation is later found to have breached a contract does not automatically give rise to a strong inference that it engaged in fraud beforehand." *Engstrom v. Elan Corp., plc,* No. 11 CIV. 1232, 2011 WL 4946434, at *11 (S.D.N.Y. Oct. 18, 2011).

 Furthermore, misrepresentation claims are held to the heightened pleading standard of Rule 9(b) and are also subject to the additional pleading requirements of the PSLRA. *See ATSI,* 493 F.3d at 101–02; *Rombach,* 355 F.3d at 175 n. 10. For a complaint based on misleading statements, the PSLRA requires that "the complaint . . . specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." *ATSI,* 493 F.3d at 99. Moreover, fraud allegations generally may not be made upon information and belief, except when concerning matters that are "peculiarly within the opposing party's knowledge." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 357 F.Supp.2d 712, 715–16 (S.D.N.Y.2005) ("*ATSI I* "), *aff'd, ATSI,* 493 F.3d 87 (*quoting Luce v. Edelstein,* 802 F.2d 49, 54 n. 1 (2d Cir.1986)). If an allegation regarding the statement or omission is made on information and belief, the PSLRA requires that "the complaint shall state with particularity all facts on which that belief is formed." *ATSI,* 493 F.3d at 99.

 However, the Second Circuit's "reading of the [PSLRA] focuses on whether the facts alleged are sufficient to support a *reasonable belief* as to the misleading nature of the statement or omission." *In re Initial Pub. Offering Sec. Litig.,* 241 F.Supp.2d at 330 (*quoting Novak,* 216 F.3d at 314 n. 1). Consequently, the PSLRA "does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based. Rather, plaintiffs need only plead with par-

90

ticularity *sufficient* facts to support those beliefs." *Novak*, 216 F.3d at 313–14.

The Court is not persuaded that Plaintiffs' allegations regarding the Credit Suisse Defendants' allegedly misleading statements fail to meet the heightened pleading standards of Rule 9(b) and the PSLRA. The CACAC makes multiple, particularized factual allegations that support Plaintiffs' assertions that the Credit Suisse Defendants knew in advance that they would use the offerings to facilitate high-volume short selling on the part of their hedge fund clients, causing ECD and its shareholders to suffer tremendous losses.

The CACAC makes the factual allegation that the Credit Suisse Defendants solicited indications of interest and established a clearing price with potential investors prior to the Offerings and "[t]hus . . . knew in advance of the Offerings how hedge funds planned to exploit the financing scheme to make large sales of ECD stock." (CACAC ¶ 41 (*quoting* the Common Stock Prospectus).) The CACAC also asserts that the Credit Suisse Defendants, working in collusion with the "predatory hedge funds," "structured the two offerings to enable the hedge funds to make huge short sales of ECD stock without having to incur the normal risks associated with such trading." (CACAC ¶ 5; *see also id.* ¶¶ 29–36.) Furthermore, the CACAC describes the high-volume short selling that followed the offerings, allegedly in direct contravention of the statements made in the Share Lending Agreement, the Common Stock Prospectus, and the Convertible Note Prospectus. (*Id.* ¶ 9.) All of these factual allegations support Plaintiffs' contention that the Credit Suisse Defendants knew about (and in fact orchestrated) the alleged scheme in advance of the Offerings, which in turn supports a reasonable inference that the misstatements at issue were false when made.

The Court finds that Plaintiffs have pleaded enough facts with sufficient particularity to support a reasonable belief that the statements at issue were false when made and therefore misleading in nature. *See Novak*, 216 F.3d at 313–14. Whether the Credit Suisse Defendants knew the statements were false at the time the statements were made clearly falls "peculiarly within the opposing party's knowledge," so Plaintiffs make no error in asserting allegations based upon information and belief. *ATSI I*, 357 F.Supp.2d at 715–716. Plaintiffs have also, as required by the PSLRA, sufficiently supported allegations made upon information and belief with statements of the facts upon which these beliefs are based. *See ATSI*, 493 F.3d at 99. Plaintiffs therefore "have pleaded enough facts to support their belief, even though some arguably relevant facts have been left out." *Novak*, 216 F.3d at 314. Accordingly, the Court finds that the CACAC states facts creating a reasonable inference that misleading statements were made within the meaning of Section 10(b), and in accordance with the heightened pleading standards of Rule 9(b) and the requirements of the PSLRA.

### 2. Misstatements "Made" by the Credit Suisse Defendants under Section 10(b) and Rule 10b–5

The Motion further argues that even if misstatements or omissions were made, such statements cannot be attributed to the Credit Suisse Defendants. The Motion cites to the Supreme Court case *Janus Capital Grp., Inc. v. First Derivative Traders* for the proposition that, for the purposes of Rule 10b–5, the "maker" of a statement is the "entity with ultimate authority over the statement, including its content and whether and how to communicate it." 564 U.S. 135, 131 S.Ct. 2296, 2302, 180 L.Ed.2d 166 (2011). The Supreme Court in *Janus* "explicitly rejected

a definition of 'make' that would 'permit private plaintiffs to sue a person who provides false or misleading information that another person then puts into the statement.'" (Mot. 12) (*quoting Janus*, 131 S.Ct. at 2302 (internal quotation marks omitted).) Furthermore, *Janus* makes clear that the "maker" of the statement is not necessarily the person or entity who prepares or publishes the statement. *Janus*, 131 S.Ct. at 2302. Rather,

> in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by— the party to whom it is attributed. This rule might best be exemplified by the relationship between a speechwriter and a speaker. Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit—or blame—for what is ultimately said.

*Id.* The Credit Suisse Defendants argue that the statements in the ECD Prospectuses cannot be attributed to the Credit Suisse Defendants, as Plaintiffs have "allege[d] no facts showing that Credit Suisse had control over the Statements in the Prospectuses." (Mot. 12.)

Plaintiffs point out that they have alleged misstatements and omissions in the Share Lending Agreement as well as the Prospectuses, and the Credit Suisse Defendants were party to the Share Lending Agreement—which was publicly filed with the SEC—and so clearly "made" the statements in the Share Lending Agreement. Plaintiffs also cite to two district court cases, *Scott v. ZST Digital Networks, Inc.*, 896 F.Supp.2d 877 (C.D.Cal.2012), and *In re Allstate Life Ins. Co. Litig.*, No. CV–098162 (D.Ariz. Jan. 23, 2012), in which underwriters were held liable for misstatements in offering memoranda. (Opp'n 15.) Plaintiffs argue that these cases show that "*Janus* does not impact securities claims

against the underwriter in an offering." (*Id.*)

The Court agrees that the Credit Suisse Defendants clearly "made" the statements in the Share Lending Agreement. As parties to the agreement, the Credit Suisse Defendants had "ultimate authority" over the statements in the Share Lending Agreement, and "in the ordinary case, attribution ... implicit from the surrounding circumstances" would lead others to attribute any statements in the Share Lending Agreement to the Credit Suisse Defendants (as well as to all other parties to the Share Lending Agreement). *Janus*, 131, S.Ct. at 2302. While the Credit Suisse Defendants claim that "statements made in contract cannot serve as the basis for a securities fraud claim" (Mot. 8; *see also* Mot. 5), such statements may in fact constitute misstatements and omissions within the meaning of Section 10(b)—as discussed above in Section V(C)(1)(b)—provided that the statements in question are shown to have been false when made. *See, e.g., Gurary*, 190 F.3d at 44.

A case from this district, *In re Puda Coal Securities, Inc., Litigation*, 30 F.Supp.3d 261 (S.D.N.Y.2014) is particularly instructive regarding whether the statements in the Prospectuses may be attributed to the Credit Suisse Defendants. *Puda* found that statements in a prospectus could be attributed to underwriters when the complaint specifically pleaded facts alleging that: (1) the underwriters "actively participated in creating the Prospectus, drafting it jointly with Puda management"; (2) that the underwriters' "sign off" was necessary for to the publication of the prospectus (as evidenced by an email from Puda's counsel); (3) that "[t]he front cover of the prospectus prominently displayed both underwriters' names, thus endorsing the statements within the prospectus to investors"; (4)

one of the underwriters "solicited investors for the offering and distributed the prospectus to investors"; and (5) the prospectus specifically "provided that the underwriters were authorized to make representations about Puda shares." *Id.* at 267.

The *Puda* court carefully distinguished the facts before it from the facts in three other relevant cases. First, the Second Circuit Court of Appeals held in *Pacific Investment Mgmt. Co. LLC v. Mayer Brown LLP* that "[t]he mere identification of a secondary actor as being involved in a transaction, or the public's understanding that a secondary actor 'is at work behind the scenes' are alone insufficient." 603 F.3d 144, 155 (2d Cir.2010). The "secondary actor" at issue in *Pacific* was a law firm that was merely "mention[ed]" in the Prospectuses. In contrast, the facts in the *Puda* complaint asserted "far more intricate involvement by the underwriters," and the *Puda* court found that "[t]he underwriters' involvement in creating, approving, and disseminating the prospectus constitute [sic] 'attribution within a statement or implicit from surrounding circumstances' sufficient for them to be 'makers' of the statements." *Puda*, 30 F.Supp.3d at 268 (*quoting Janus*, 131 S.Ct. at 2302).

Second, *SEC v. Tambone* held that statements in a prospectus could not be attributed to securities professionals who were alleged to have disseminated the prospectus, but were not alleged to have played a role in preparing the prospectus. *See* 597 F.3d 436, 447 (1st Cir.2010). In contrast, the *Puda* complaint alleged that the underwriters were involved in preparing and signing off on the prospectus, as well as distributing the prospectus. *See Puda*, 30 F.Supp.3d at 268.

Finally, *In re Fannie Mae 2008 Sec. Litig.*, a case in this District that was later affirmed by the Second Circuit, held that misstatements could not be attributed to an underwriter based on the complaint's

generalized, conclusory statements that the underwriter "made" the alleged misstatements. 891 F.Supp.2d 458, 485 (S.D.N.Y.2012), *aff'd*, 525 Fed.Appx. 16 (2d Cir.2013). However, the *Fannie Mae* plaintiffs did not allege additional facts supporting attribution, but based their claims only on the underwriters' participation in preparing the Fannie Mae prospectus. *See id.; Puda*, 30 F.Supp.3d at 268. Additionally, the misrepresentations in the prospectus at issue in Fannie Mae were contained in statements incorporated by reference from previous SEC filings over which clearly Fannie Mae, rather than the underwriter, had the ultimate authority. *Id.* In contrast, the prospectus at issue in Puda contained the false statements in their original form. *See Puda*, 30 F.Supp.3d at 268.

■ In support of the argument that the Credit Suisse Defendants did "make" the identified misstatements in the Prospectuses in the case at hand, the CACAC alleges that

> the Credit Suisse Defendants prepared and/or substantially contributed to the misleading statements in the Common Stock and Convertible Note Prospectuses as alleged herein.

(CACAC ¶ 14.) The CACAC further alleges that the

> Credit Suisse [Defendants] intentionally and knowingly caused the Common Stock Prospectus and Convertible Notes Prospectus to include materially false and misleading statements that concealed the true purpose of the financing scheme.

(*Id.* ¶ 37.) Unlike in *Fannie Mae*, the alleged misstatements in the case at hand appear originally in the Prospectuses, and also concern the Share Lending Agreement, to which the Credit Suisse Defendants were party and the contents of which *can* clearly be attributed to the

Credit Suisse Defendants. However, while the CACAC does allege that the Credit Suisse Defendants solicited interest in advance of the publication of the Prospectuses, the CACAC has alleged no further facts supporting an attribution theory. Additionally, unlike in Puda—and similar to Fannie Mae—the CACAC's assertions that the Credit Suisse Defendants prepared the Prospectuses or otherwise caused the Prospectuses to contain misleading statements are general and conclusory, rather than specific and particularized. *Compare* CACAC ¶¶ 14, 37 *with Puda*, 30 F.Supp.3d at 267.

The relevant precedent therefore suggests that Plaintiffs have alleged neither the Credit Suisse Defendants' role in preparing the Prospectuses, nor other facts and circumstances supporting attribution of the statements to the Credit Suisse Defendants, with enough particularity to warrant a finding that the Credit Suisse Defendants "made" the statements within the meaning of Section 10(b) and Rule 10b–5. Accordingly, the Court finds that, while Plaintiffs have pleaded enough facts to give rise to a reasonable inference that the Credit Suisse Defendants "made" the alleged misstatements and omissions in the Share Lending Agreement under Section 10(b) and Rule 10b–5, the CACAC has failed to plead facts showing that the Credit Suisse Defendants "made" the alleged misleading statements in the Prospectuses.

## C. *SCIENTER*

The Credit Suisse Defendants argue that Plaintiffs have failed to allege facts giving rise to a strong inference of scienter. Although Plaintiffs must show scienter as an element of each separate claim, the Court will discuss scienter as it applies to all of Plaintiffs' claims at once, given that all the claims arise from the same set of facts and allegations.

As discussed above, scienter under the Exchange Act is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319, 127 S.Ct. 2499 (2007). "[T]o qualify as a 'strong inference,' the inference of scienter must be 'more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" *ECA*, 553 F.3d at 198 (*quoting Tellabs*, 551 U.S. at 310, 127 S.Ct. 2499) (internal quotations marks omitted). The PSLRA also requires that the facts giving rise to a strong inference of scienter be stated with particularity. *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir.2008); *Employees' Ret. Sys.*, 794 F.3d 297, 2015 WL 4491319, at *7. The requisite strong inference of scienter can be established by "alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198. A complaint adequately alleges scienter when it pleads facts demonstrating that the defendants "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Employees' Ret. Sys.*, 794 F.3d 297, 2015 WL 4491319, at *7.

In determining whether a complaint has sufficiently alleged scienter, "[a] court ... must assess the complaint in its entirety, and not scrutinize each allegation." *Id.* (*citing Tellabs*, 551 U.S. at 326, 127 S.Ct. 2499). The Court will therefore address the various allegations within the CACAC that could support a reasonable inference of scienter, and then will address whether it finds that the CACAC, when

read in its entirety, with all relevant well-pleaded allegations accepted as true and considered together for the purposes of this Motion, supports a strong inference of scienter. Upon such evaluation, the Court concludes that Plaintiffs have adequately alleged scienter with regard to all of their claims.

### 1. *Motive and Opportunity*

To demonstrate "motive and opportunity" to defraud, Plaintiffs must allege that the Credit Suisse Defendants benefited in some concrete and personal way from the purported fraud. *ECA*, 553 F.3d at 198. Opportunity is generally assumed where the defendant is a corporation or corporate officer, such as the Credit Suisse Defendants. *See, e.g., In re Astrazeneca Sec. Litig.*, 559 F.Supp.2d 453 at 468. However, motive must be pleaded with particularity, and "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive'" for purposes of demonstrating scienter. *ECA*, 553 F.3d at 198 (*citing Novak*, 216 F.3d at 307; *Kalnit*, 264 F.3d at 139); *see also In re Merrill Lynch Auction Rate Sec. Litig.*, 851 F.Supp.2d 512, 528–29 (S.D.N.Y.2012) *aff'd sub nom. Louisiana Pac. Corp. v. Merrill Lynch & Co.*, 571 Fed.Appx. 8 (2d Cir. 2014) ("Plaintiff's scienter allegations fall short of the motive and opportunity standard because they amount to no more than allegations of a general business motive to make a profit.").

The CACAC alleges that the Credit Suisse Defendants "benefited in two ways from the scheme alleged herein." (CACAC ¶ 16.) First, the Credit Suisse Defendants were "paid a share of the $8.25 million commission for underwriting the Convertible Note Offering." (*Id.*) Second, the Credit Suisse Defendants were able to promote [themselves] to hedge funds by helping them gain exorbitant profits through the short selling scheme Credit Suisse operated. Investment banks, such as Credit Suisse, competed heavily for the approximately $4 billion in brokerage fees paid to investment banks by hedge funds by providing these funds with access to information and favorable investment options. The short selling scheme Credit Suisse devised was an attractive investment option that allowed Credit Suisse to strengthen its brand name in the lucrative hedge fund brokerage fee market.

(*Id.*)

That the Credit Suisse Defendants received a "share" of the $8.25 million commission for underwriting the offerings does not by itself support a strong inference of scienter. The CACAC does not allege that any particular financial benefit was contingent upon the Credit Suisse Defendants allegedly carrying out their manipulative scheme. Rather, it alleges that the Credit Suisse Defendants received a "share" of the $8.25 million commission simply by playing the role of underwriter, regardless of the alleged scheme. *Contra Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 651 F.Supp.2d 155, 180 (S.D.N.Y.2009) (finding facts sufficient to raise a plausible inference of scienter when receipt of fees was *dependent* on the perpetration of the fraud at issue). This bare allegation therefore fails to show that the Credit Suisse Defendants "benefitted in some concrete and personal way from the purported fraud." *Novak*, 216 F.3d, at 307–08. Rather, the CACAC makes allegations that essentially "amount to no more than allegations of a general business motive to make a profit." *See In re UBS AG Sec. Litig.*, No. 07 CIV. 11225, 2012 WL 4471265, at *14 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Po-*

*licemen's & Firemen's Ret. Sys. v. UBS AG,* 752 F.3d 173 (2d Cir.2014).

However, the allegation that the Credit Suisse Defendants employed the alleged scheme to "strengthen [their] brand name in the lucrative hedge fund brokerage fee market" in order to enhance their ability to compete for brokerage fees paid to investment banks by hedge funds is compelling. (CACAC ¶ 16.) The Credit Suisse Defendants argue that "it is nonsensical that [the Credit Suisse Defendants] would devise a scheme to drive *down* the stock of an issuer in order to 'promote' [themselves] to hedge funds." (Reply 11.) Perhaps the Credit Suisse Defendants are not aware that it is not unusual for businesses engaged in stiff competition to engage in short term practices that may strike common sense as uneconomic, counter-intuitive, even irrational—loss leaders, for instance. At times, carried to excess, some such common commercial behavior crosses the line into illegality. Here, the clear implication of Plaintiffs' allegations is that the hedge fund market was highly lucrative, intensely competitive, and attractive to the Credit Suisse Defendants, while the business of young companies strapped for cash, such as ECD, was paltry and inessential in comparison.

It is not at all implausible that, in such circumstances, the business of companies such as ECD would seem relatively expendable to "global leader[s] in investment banking" such as the Credit Suisse Defendants. (*Id.*) It is equally plausible that the Credit Suisse Defendants might have seen the intensely profitable business of hedge funds, on the other hand, as a golden goose, and might therefore have thought it worth taking a risk in order to obtain some of its hatch. Furthermore, it is not unreasonable to infer, as Plaintiffs' allegations

suggest, that the fraud claimed, through which the Credit Suisse Defendants' hedge fund clients were allegedly able to reap massive profits with hardly any downside (*see, e.g.,* CACAC ¶ 5), could have been seen by the Credit Suisse Defendants as a promising way to ingratiate themselves with the hedge fund market, opening the door for more and more lucrative business from that market in the future—business that may been unattainable by them without the manipulation and deception Plaintiffs describe in the CACAC.

Citing *Cohen,* the Credit Suisse Defendants argue that the allegations regarding the "desire to make money off of services . . . offer[ed to] clients are insufficient to allege scienter." (Reply 11 (*citing Cohen,* 722 F.Supp.2d at 428–29).) However, *Cohen* is inapposite. In *Cohen,* the plaintiffs alleged that the defendants engaged in "naked short selling" [6] and that doing so "allow[ed] [the defendants] to earn more money through the charging of fees, commissions and/or interest through phantom securities transactions" and to profit in their own accounts. *Id.* at 421. The *Cohen* court, in holding that the plaintiffs had failed to plead facts giving rise to a strong inference of scienter, noted that courts have "repeatedly rejected" "*generalized* profit-seeking motives*" in pleading scienter. *Cohen,* 722 F.Supp.2d at 429 (emphasis added). As discussed above, because it is assumed that all commercial businesses seek to make money, claims that amount to "no more than allegations of a general business motive to make a profit," such as those in *Cohen,* cannot support an inference of scienter. *In re Merrill Lynch Auction Rate,* 851 F.Supp.2d at 528–29. *See also Cohen,* 722 F.Supp.2d at 429; *Edison Fund v. Cogent Inv. Strategies*

---

**6.** The facts in *Cohen* are discussed in more detail *supra* in Section V(A)(1)(a) of this Decision and Order.

*Fund, Ltd.,* 551 F.Supp.2d 210, 227 (S.D.N.Y.2008) ("To accept a generalized allegation of motive based on a desire to continue to obtain management fees would read the scienter requirement out of the statute.")

However, the CACAC's allegations that the manipulation and deception alleged on the part of the Credit Suisse Defendants allowed them to "promote" themselves to hedge funds in order to better compete for the highly lucrative business of hedge funds is not generalized. (CACAC ¶ 16.) Plaintiffs have not alleged merely that the purported scheme allowed the Credit Suisse Defendants to make a profit from the transaction at issue, or to keep receiving fees. Rather, the CACAC alleges motives that encompass larger and longer-term financial ends. Fairly read, the CACAC strongly suggests that, through the fraud alleged therein, the Credit Suisse Defendants were able to improve their ability to access a specific and extremely profitable market, potentially worth billions of dollars. (*Id.*)

The Credit Suisse Defendants also cite *In re Cross Media Marketing Corporation Securities Litigation* for the proposition that the "desire to protect and enhance executive positions, substantial compensation, and prestige [is] insufficient to show fraudulent motive." 314 F.Supp.2d 256, 265 (S.D.N.Y.2004). They argue that "mere allegations regarding Credit Suisse's desire to improve its image does [sic] not establish a 'strong inference' of scienter" (Reply 12). However, the plaintiffs in *In re Cross* alleged that individual (rather than corporate) defendants had "deceived the investing public regarding the business, finances and value of Cross Media's assets and securities" (*id.* at 259) in an effort to protect or advance their own positions within an organization, and to maintain the compensation and prestige associated with holding such executive po-

sitions (*id.* at 265). The *In re Cross* court held that such allegations were insufficient to show motive giving rise to a strong inference of scienter. *Id.* Cf. *Dynex,* 531 F.3d at 196 (observing that scienter could not be "based on motives possessed by virtually all corporate insiders, including . . . the desire to . . . sustain the appearance of corporate profitability, or of the success of an investment." (*citing Novak,* 216 F.3d at 307)). Because the case at hand involves allegations that corporate defendants acted not upon a desire to maintain the appearance of profitability or the prestige or income associated with their commercial status or position in a particular market, but rather with the goal of securing a specific, highly profitable new business opportunity, *In re Cross Media* is not applicable here.

The Court finds that the CACAC has pleaded sufficient facts with the necessary particularity to give rise to a strong inference that the Credit Suisse Defendants "benefitted in [a] concrete and personal way from the purported fraud," and has therefore adequately pleaded "motive and opportunity to commit fraud." *Novak v. Kasaks,* 216 F.3d at 307–08. Accordingly, the Court finds that Plaintiffs have pleaded facts giving rise to a strong inference of scienter based on motive and opportunity. *See ECA,* 553 F.3d at 198.

## 2. *Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness*

Although Plaintiffs need only plead motive and opportunity *or* strong circumstantial evidence of conscious misbehavior or recklessness to adequately plead scienter (*id.*), the Court will nonetheless examine whether Plaintiffs have pleaded facts giving rise to a strong inference of scienter based upon strong circumstantial evidence of conscious misbehavior or recklessness.

Plaintiffs may allege facts supporting a strong inference of conscious misbehavior or recklessness by demonstrating " 'deliberate illegal behavior' or conduct that was 'highly unreasonable' and 'an extreme departure from the standards of ordinary care.' " *Cohen,* 722 F.Supp.2d at 430 (*citing Novak,* 216 F.3d at 308 (internal quotation marks omitted)). Examples of deliberate illegal behavior constituting conscious misbehavior include "securities trading by insiders privy to undisclosed and material information, or knowing sale of a company's stock at an unwarranted discount." *Novak,* 216 F.3d at 308 (internal citations omitted). "[S]ecurities fraud claims typically ... suffice[ ] to state a claim based on recklessness[, on the other hand], when they ... specifically allege[ ] defendants' knowledge of facts or access to information contradicting their public statements." *Id.*

To support its claims that the Credit Suisse Defendants intentionally engaged in a scheme to manipulate the price of ECD stock and mislead investors, the CACAC provides the following circumstantial evidence: (1) the structure of the Offerings, which allegedly removed traditional obstacles to high-volume short selling and placed perverse incentives on investors (CACAC ¶¶ 29–36); (2) the solicitation-related communications the Credit Suisse Defendants had with potential investors prior to the Offerings (*id.* ¶ 41); and (3) the "rampant" short selling that occurred after the Offerings, driving down the price of ECD's stock (*id.* ¶ 28; ¶¶ 42–47).

### a. *Structure of Offerings*

Plaintiffs ask the Court to infer scienter from, among other things, their allegations that "the Credit Suisse Defendants structured the twin offerings." (Opp'n 17.) The CACAC provides extensive detail (CACAC ¶ 29–36) about the perverse incentives offered to investors through the Offerings, allegedly designed by the Credit Suisse Defendants, demonstrating how the structure of the Offerings "created a perfect 'heads I win, tails you lose' investment vehicle [for the Credit Suisse Defendants] to sell to hedge funds" (*id.* ¶ 31). Plaintiffs effectively argue that their allegation that the Credit Suisse Defendants structured the Offerings, and in doing so created an investment vehicle through which investors could profit hugely even if—and especially if—the price of ECD stock fell, is circumstantial evidence that the Credit Suisse Defendants *intended* to design an investment vehicle that would enable investors to manipulate and depress the price of ECD stock.

It is important to note that, on its face and considered in isolation, a tandem offering of common stock and convertible notes, even with a low borrowing fee, does not necessarily suggest illegal behavior or a departure from the standards of ordinary care. Short selling and floorless convertible securities are not illegal, inherently unreasonable, or outside the realm of the standards of ordinary care. In fact, as the *ATSI* court explained, both investment vehicles can be valuable assets to companies in need of capital. "[A]side from providing market liquidity, short selling enhances pricing efficiency by helping to move the prices of overvalued securities toward their intrinsic values." *ATSI,* 493 F.3d at 101. Furthermore, "floorless convertible securit[ies]" can "provide distressed companies with access to much-needed capital and, so long as their terms are fully disclosed, can provide a transparent hedge against a short sale." *Id.*

Indeed, ECD represented in the Prospectuses that it was a relatively distressed company at the time of the Offerings. The Convertible Notes Prospectus stated that ECD had accumulated a deficit of $335 million (*see* Convertible Notes Prospectus at S–12) and faced significant risks

to its business for various reasons, including competition within the field, a small customer base, and dependency on raw materials (see Convertible Notes Prospectus at S–12—S–24). In fact, the Common Stock Prospectus stated, after explaining that entering into the Share Lending Agreement with the Credit Suisse Defendants might result in the lowering of the market price of ECD stock,

> we have determined that the entry into the share lending agreement is in our best interests as they are a means to facilitate the offer and sale of the notes on terms more favorable to us than we could have otherwise obtained.

(Common Stock Prospectus at S–36.)

However, while there may be a nonculpable explanation of the Credit Suisse Defendants' conduct in structuring the Offerings, the existence of such an explanation does not defeat a finding of scienter where "a reasonable person would [still] deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324, 127 S.Ct. 2499. In Plaintiffs' allegations that the Credit Suisse Defendants—although hired by ECD to advance ECD's interests—"*designed* the Offerings to allow hedge funds to make massive negative bets against ECD stock without the risks normally associated with short sales," (CACAC ¶ 40 (emphasis added)), and that the Credit Suisse Defendants' structuring of the Offerings did allow hedge fund clients to engage in high-volume short selling with minimal risk (*id.* ¶¶ 29–36), reaping more and more profits the lower the price of ECD's stock price sunk (*id.* ¶ 5.), the Court finds sufficient pleading of circumstantial evidence that may support an inference that the Credit Suisse Defendants acted with the requisite "intent to deceive,

manipulate, or defraud." *Tellabs*, 551 U.S. at 319, 127 S.Ct. 2499.

The Court notes that the Second Circuit held in ATSI that "[a] strong inference of scienter is not raised by alleging that a legitimate investment vehicle, such as the convertible preferred stock at issue here, creates an opportunity for profit through manipulation." 493 F.3d at 104 (internal quotation marks and citations omitted). However, the facts in ATSI are distinguishable from the case at hand.[7] Regarding scienter, the most important difference between ATSI and the instant action is that the plaintiffs in *ATSI* did not allege that the defendants had structured and designed the "legitimate investment vehicle" at issue. *Id.* Rather, the *ATSI* plaintiffs sought to show that the defendants essentially took advantage of the properties of the securities (convertible notes) they purchased to engage in a manipulative scheme. *Id.*

In the instant action, on the other hand, Plaintiffs allege that the structure of the "investment vehicle"—the Offerings—is essentially part and parcel of the Credit Suisse Defendants' allegedly manipulative and misleading conduct. (*See* CACAC ¶ 40.) Rather than alleging that a legitimate investment vehicle created an opportunity for profit through manipulation, Plaintiffs have alleged that, through manipulation and deception, the Credit Suisse Defendants knowingly and intentionally *created* an investment vehicle that, in relation to the business interests of their particular client, was bound to fail and cause financial harm, specifically one through which hedge funds were able to manipulate the market price of ECD stock for their own gain and to the detriment of ECD and its shareholders. (*See id.* at ¶¶ 40, 29–36.)

---

7. *See supra* Section V(A)(1)(a) for a more detailed discussion of the facts involved in ATSI.

The Court therefore finds that the CACAC's allegations regarding the structure of the Offerings, while not giving rise to a strong inference of scienter on their own, constitute evidence that may lend support to such an inference when the CACAC is evaluated as a whole. *See Tellabs,* 551 U.S. at 323, 127 S.Ct. 2499.

b. *Solicitation Conversations Prior to the Offerings*

Plaintiffs also allege that, in advance of the Offerings, the Credit Suisse Defendants

"solicited indications of interest, based on the purchase price negotiated with those potential purchasers, from convertible notes investors seeking to establish a hedge position" and "established a 'clearing price' for a number of borrowed shares at which both purchasers of our common stock were willing to purchase borrowed shares offered hereby and investors in our convertible notes were willing to establish hedge positions."

(CACAC ¶ 41 (*quoting* the Common Stock Prospectus).) Plaintiffs assert that, "Thus, [the] Credit Suisse [Defendants] knew in advance of the Offerings how hedge funds planned to exploit the financing scheme to make large sales of ECD stock." (CACAC ¶ 41.) Plaintiffs ask the Court to infer scienter based upon this evidence. (*See* Opp'n 17.)

The Court finds that Plaintiffs' allegations regarding the solicitation conversations between the Credit Suisse Defendants and their hedge fund clients constitute circumstantial evidence that may support a strong inference of scienter when analyzed in totality with all the other relevant allegations in the

CACAC. *See Tellabs,* 551 U.S. at 323, 127 S.Ct. 2499. Where Plaintiffs allege a manipulative scheme "orchestrated by [the] Credit Suisse [Defendants] and the hedge funds" in concert to structure and then use the Offerings to manipulate the price of ECD stock (CACAC ¶ 9), allegations regarding conversations the Credit Suisse Defendants had with their hedge fund clients prior to the offerings, at which they allegedly discussed the details related to the scheme, clearly would constitute circumstantial evidence that may support intent to deceive.

The Credit Suisse Defendants argue that Plaintiffs' allegations regarding the solicitation conversations are "far too vague to create a strong inference (or any inference) of scienter." (Mot. 12.) While Defendants cite Ninth Circuit case law,[8] courts' decisions within the Second Circuit have similarly held that allegations that are "general" (*Monroe Cnty. Employees' Ret. Sys. v. YPF Sociedad Anonima,* 15 F.Supp.3d 336, 357 (S.D.N.Y.2014)) or "too conclusory and lacking in detail" (*City of Brockton Ret. Sys. v. Avon Products, Inc.,* No. 11 CIV. 4665, 2014 WL 4832321, at *24 (S.D.N.Y. Sept. 29, 2014)) cannot give rise to a strong inference of scienter. *See also Ganino v. Citizens Util. Co.,* 228 F.3d 154, 169 (2d Cir.2000).

However, while Plaintiffs have not provided certain details—such as the dates the solicitation conversations occurred and which hedge funds and individuals were involved in each conversation—Plaintiffs have pointed to public information demonstrating that these solicitation conversations did occur, and making clear that the particulars of the hedge positions that

**8.** As discussed *supra* in Section II of this decision and Order, the Motion was filed prior to the transfer of the instant action from the Northern District of California to this

Court. Consequently, the parties' briefs largely address the Ninth Circuit's interpretations of the relevant laws. *See also supra* note 2.

would be established by investor hedge funds pursuant to the Offerings were discussed in some detail during these conversations. (CACAC ¶ 41.) Absent discovery, which of course has not yet happened at this early stage of the proceedings, the Court is satisfied that Plaintiffs' allegations regarding the solicitation conversations are not overly general or conclusory so as to run astray of Second Circuit case law, Rule 9(b), or the PSLRA. From the facts alleged, while not the only possible inference, it is certainly a plausible inference that the alleged solicitation conversations between the Credit Suisse Defendants and their hedge fund clients involved collusion regarding the fraud alleged in the CACAC.

The Court therefore finds that Plaintiffs' allegations regarding the solicitation conversations between the Credit Suisse Defendants and their hedge fund clients, may support an inference of scienter when analyzed not separately or in isolation, but in totality with all the other relevant allegations in the CACAC. *See Tellabs,* 551 U.S. at 323, 127 S.Ct. 2499.

### c. *High–Volume Short Selling After the Offerings*

The CACAC provides significant detail regarding the high-volume short sales that occurred after the Offerings while the price of ECD stock plummeted and investors shorting ECD stock reaped huge profits. (*See, e.g.,* CACAC ¶¶ 42–45.)

As with much of the other circumstantial evidence presented by Plaintiffs, the Court concludes that Plaintiffs' allegations regarding the high-volume short sales that occurred after the Offerings do not in and of themselves give rise to a strong inference of scienter. *See Tellabs,* 551 U.S. at 323, 127 S.Ct. 2499. However, because Plaintiffs allege that the Credit Suisse Defendants . engaged in a manipulative scheme to facilitate the rampant short sell-

ing of ECD Stock by their hedge fund clients, the allegations that such short selling ultimately did occur constitute at least relevant circumstantial evidence of the requisite intent to deceive.

### 3. *Facts Considered Collectively*

█ Having considered individually each piece of evidence proffered by Plaintiffs in support of their allegations of scienter, the Court now considers the evidence in its totality, and also considers all plausible opposing inferences. *Id.* at 323, 127 S.Ct. 2499. In determining whether a complaint has pleaded factual allegations giving rise to a strong inference of scienter, "[a] court ... must assess the complaint in its entirety, and not scrutinize each allegation." *Employees' Ret. Sys.,* 794 F.3d 297, 2015 WL 4491319, at *7. In doing so, the Court finds that Plaintiffs have pleaded facts giving rise to a strong inference of scienter.

In showing that the Credit Suisse Defendants have "benefitted in a concrete and personal way from the purported fraud" (*Employees' Ret. Sys.,* 794 F.3d at 305) by enhancing their ability to gain further access to the lucrative hedge fund market, Plaintiffs have alleged facts demonstrating sufficient motive and opportunity on the part of the Credit Suisse Defendants to commit the fraud alleged. (*See supra* Section V(C)(1).) Furthermore, Plaintiffs have alleged facts that— when considered together—constitute strong circumstantial evidence that the Credit Suisse Defendants engaged in intentional misbehavior or recklessness with regard to the facts alleged. (*See supra* Section V(C)(2).) Plaintiffs' factual allegations regarding the structure of the Offerings the Credit Suisse Defendants allegedly designed, combined with the allegations regarding the solicitation conversations the Credit Suisse Defendants

had with their hedge fund clients prior to the Offerings, as well as the allegations that high-volume short selling did occur after the Offerings, together constitute facts showing that the Credit Suisse Defendants either "engaged in deliberately illegal behavior" or at least "knew facts or had access to information suggesting that their public statements were not accurate." *Employees' Ret. Sys.*, 794 F.3d 297, 2015 WL 4491319, at *7. Furthermore, the conduct alleged by Plaintiffs—that the Credit Suisse Defendants, while working *for* ECD as the underwriter of the Offerings, acted as "architect[s] of and key participant[s] in" a manipulative scheme to "decimate" the price of ECD stock for the benefit of "predatory hedge funds" and to the *detriment* of ECD and its shareholders (CACAC ¶ 5), all the while concealing its tactics and intentions from ECD and the investing public (*id.* ¶ 40)—is clearly "highly unreasonable and . . . represents an extreme departure from the standards of ordinary care." *Kalnit*, 264 F.3d at 142.

In arguing that they have sufficiently alleged scienter, Plaintiffs analogize the facts in the case at hand to those in *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F.Supp.2d 624 (S.D.N.Y.2012), in which this Court found that scienter had been adequately alleged with regard to the plaintiffs' market manipulation[9] and misstatement claims under Section 10(b). (Opp'n 17.) The Court finds this comparison to be on point and persuasive. In *Dodona I*, the plaintiffs argued that the act of structuring, offering, and selling the securities at issue was itself a manipulative market activity, and that these acts were manipulative and deceptive—and therefore

gave rise to an inference of scienter—because Defendants knew that these securities would likely not be profitable for investors and yet represented otherwise to investors. *Id.* at 650. Similarly, in the case at hand, Plaintiffs argue that the Credit Suisse Defendants' structuring of the Offerings—which allowed for manipulation of the ECD's stock prices by hedge funds—was itself manipulative and deceptive, because the Credit Suisse Defendants knew that their hedge fund clients intended to and would take advantage of the Offering structure they created, but failed to disclose this information to ECD and its shareholders. (*See generally* CACAC.)

It is true that the facts alleged in *Dodona I* included more detail illustrating scienter than do the facts alleged in the case at hand. For example, the Plaintiffs in *Dodona I* alleged the existence of, among other things, emails from the defendants demonstrating their knowledge of material facts and information that clearly contradicted their public statements. *See, e.g.*, 847 F.Supp.2d at 641–44. However, there is no reason to assume that the detailed facts alleged in *Dodona I* represent the minimum threshold of circumstantial evidence required to give rise to a strong inference of scienter.

To the contrary, "[a]lthough speculation and conclusory allegations will not suffice [to show scienter], neither do we require 'great specificity' provided the plaintiff alleges enough facts to support 'a strong inference of fraudulent intent.'" *Ganino*, 228 F.3d at 169 (*quoting Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir.1999)). Moreover, while the PSLRA requires that the facts giving rise to a

---

9. The market manipulation claim in *Dodona I* was ultimately dismissed due to the plaintiffs' failure to adequately allege "reliance on an assumption of an efficient market free of manipulation." 847 F.Supp. 2d at 651. In the

case at hand, however, the Motion does not argue that Plaintiffs have failed to adequately allege this element of market manipulation. (*See* Opp'n 11 n. 9; *supra* Section IV(B). *See generally* Mot.)

strong inference of scienter be stated with particularity (*Dynex*, 531 F.3d at 194), as discussed in *supra* Section V(B)(1), the heightened pleading standard of the PSLRA "does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based. Rather plaintiffs need only plead with particularity sufficient facts to support those beliefs." *Novak*, 216 F.3d at 313–14. In *Dodona I*, this Court opined that, "[i]n sum, the Court finds in its 'practical judgment' that the 'whole factual picture painted by the [C]omplaint' gives rise to a strong inference of scienter." 847 F.Supp.2d 624, 645 (S.D.N.Y.2012) (*quoting Slayton v. American Express Co.*, 604 F.3d 758, 775 (2d Cir.2010)). The Court finds that the same is true in the instant action.

While accepting all well-pleaded factual allegations in the CACAC as true and drawing all reasonable inferences in Plaintiffs' favor, as the Court is required to do when adjudicating a motion to dismiss (*see Chambers*, 282 F.3d at 152), the Court finds that the factual allegations pleaded by Plaintiffs give rise to a strong inference of scienter as required by each of Plaintiffs' claims for relief—market manipulation under Section 10b and Rule 10b–5, a series of transactions with the intent to induce sales and depress the price of ECD stock under Section 9(a)(2), and false or misleading statements under Section 10(b), Rule 10b–5, and Section 9(a)(4)—and that Plaintiffs have pleaded scienter with the particularity required by the heightened pleading standards provided by Rule 9(b) and the PSLRA. While there may be opposing, nonculpable inferences that may be drawn from the facts pleaded, the Court finds that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324, 127 S.Ct. 2499.

## D. LOSS CAUSATION

■ The Credit Suisse Defendants argue that Plaintiffs have failed to adequately allege loss causation with regard to their market manipulation and misrepresentation claims under Section 10(b) and Rule 10b–5.[10] While the term "loss causation"[11] is more frequently used with regard to claims of misstatements and omissions, all securities fraud claims made pursuant to the Exchange Act require plaintiffs to "adequately allege and prove the traditional elements of causation and loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). However, "[l]oss causation

10. Again, below a broad heading titled "Plaintiffs Fail To State A Claim Under Section 10(b) or Section 9" (Mot. 6.), the Motion asserts that Plaintiffs have failed to allege loss causation (Mot. 13–15). However, similar to the Motion's treatment of its arguments regarding market manipulation and misrepresentation, in content the Motion argues exclusively that Plaintiffs have not alleged loss causation with regard to Plaintiffs' claims for market manipulation and misrepresentation in violation of Section 10(b) and Rule 10b–5—citing to case law applicable only to those sections—and with no separate discussion of loss causation under Section 9. The Court will therefore construe the Motion as arguing only that Plaintiffs have failed to allege loss causation under their claims pursuant to Section 10(b) and Rule 10b–5, and will not discuss the standards applicable to analyzing such claims—or the sufficiency of the CACAC's allegations under—Section 9.

11. "[A] plaintiff is required to prove both transaction causation (also known as reliance) and loss causation." *ATSI*, 493 F.3d at 106. However, the Credit Suisse Defendants have not argued that Plaintiffs have failed to allege transaction causation (*see generally* CACAC). Hence the Court will address only loss causation.

need not be pled with particularity. A short and plain statement in accordance with Rule 8 of the Federal Rules of Civil Procedure is sufficient." [12] *In re Citigroup Inc. Sec. Litig.,* 753 F.Supp.2d at 234.

The Court finds that Plaintiffs have adequately pleaded facts giving rise to a reasonable inference of loss causation with regard to their misrepresentation and omission claims under Section 10(b) and Rule 10b–5.

### 1. *Loss Causation with Regard to Market Manipulation*

The Credit Suisse Defendants argue that Plaintiffs have failed to show loss causation with regard to their manipulation claims. The Motion argues that Plaintiffs have failed to link "any conduct *on the part of Credit Suisse*" to their damages, asserting that

> "[t]he [CACAC] alleges only that [the Credit Suisse Defendants] underwrote the Offerings . . . and . . . made certain shares available for short sales . . . Absent allegations linking "fraudulent conduct" on the part of Credit Suisse to Plaintiffs' losses (as opposed to blaming Plaintiffs' losses on massive 'short selling' by unidentified traders, using shares that Plaintiffs have made no effort to link to [the] Credit Suisse Defendants, Plaintiffs have failed to allege loss causation."

(Mot. 14 (emphasis in original).) The Court has already found that Plaintiffs have adequately alleged that the Credit Suisse Defendants participated in a manipulative scheme to depress the price of ECD stock (*see supra* Section V(B)(2)), so Plaintiffs have adequately pleaded "fraud-

ulent conduct" on the part of the Credit Suisse Defendants.

Plaintiffs have also clearly pleaded enough facts evidencing a link between the alleged manipulative scheme and their damages. Plaintiffs have shown in some detail exactly how the structure of the Offerings allowed investors to manipulate and depress the price of ECD stock (CACAC ¶¶ 26–36), and have shown that following the Offerings, short sales of ECD stock skyrocketed while the price of ECD stock plummeted (*id.* ¶¶ 42, 45). While it is true, as the Credit Suisse Defendants point out, that ECD did not declare bankruptcy until more than four years after the Offerings, Plaintiffs have more than adequately pleaded facts giving rise to a plausible inference that the Offerings caused a depression in the price of ECD stock from which ECD never recovered. Plaintiffs have therefore "made allegations sufficient to support a reasonable inference that the [manipulative actions of the Credit Suisse Defendants] 'bear upon the loss suffered such that [Plaintiffs] would have been spared all or an ascertainable portion of that loss absent the fraud.'" *Dodona I,* 847 F.Supp.2d at 650 (*quoting Lentell,* 396 F.3d at 175).

### 2. *Loss Causation with Regard to Misstatements and Omissions*

The Credit Suisse Defendants argue that Plaintiffs have failed to show loss causation with regard to their false statement claims because, in order to satisfy this requirement, a complaint "must allege that practices that the plaintiff contends are fraudulent were revealed to the market and caused the resulting loss." (Mot. 15.)

---

**12.** As discussed in *supra* Section IV(B)(5), the Second Circuit Court of Appeals has declined to address whether or not loss causation is subject to the heightened pleading standards of Rule 9(b). In accordance with the prevailing practice in this District, the Court will analyze loss causation under the notice pleading standard of Rule 8.

■ This argument reflects a mischaracterization of the applicable law. Loss satisfying the requirements of a securities fraud claim based on misrepresentation under the Exchange Act must be (1) foreseeable [13] and (2) caused by the materialization of the concealed risk. *See Lentell,* 396 F.3d 161. Moreover, while alleging a disclosing event that negatively impacts the market is one way to show loss causation, it is not the only way. As a court in this district stated,

> Where the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss, it is the materialization of the undisclosed condition or event that causes the loss. By contrast, where the alleged misstatement is an intentionally false opinion, the market will not respond to the truth until the falsity is revealed—i.e. a corrective disclosure.

*In re Initial Pub. Offering Sec. Litig.,* 399 F.Supp.2d 298, 307 (S.D.N.Y.2005) (internal footnotes removed).

■ In the case at hand, the alleged misstatements concealed a false condition or event. Specifically, Plaintiffs allege that the identified statements misrepresented how investors would use securities from the Offering (by representing that the Credit Suisse Defendants would use the ECD Stock solely to allow investors to "hedge" their positions in the Convertible Notes, when in fact Credit Suisse planned to facilitate investors' massive, coordinated short sales of ECD Stock). (*See* CACAC ¶ 40.) Plaintiffs have alleged that when the concealed conditions and events materialized—following the Offerings, short sales rose dramatically, allegedly due to the coordinated, manipulative efforts of the Credit Suisse Defendants and their clients—the price of ECD stock sunk in response, causing Plaintiffs' losses. *See id.* ¶ 45.

Plaintiffs have therefore alleged facts sufficient to give rise to a plausible inference of loss causation with regard to their misstatement and omission claims under Section 10(b) and Rule 10b–5 and in accordance with the notice pleading requirements of Rule 8 of the Federal Rules of Civil Procedure.

## VI. *ORDER*

For the reasons stated above, it is hereby

**ORDERED** that the Request for Judicial Notice (Dkt. No. 54) of defendants Credit Suisse International and Credit Suisse Securities (USA) LLC (the "Credit Suisse Defendants") is **GRANTED;** and it is further

**ORDERED** that the Motion (the "Motion," Dkt. No. 53) of the Credit Suisse Defendants to dismiss the Consolidated Amended Class Action Complaint (Dkt. No. 48) is **GRANTED IN PART** insofar as Plaintiffs' claims arising out of misleading statements or omissions allegedly made in the two Prospectuses of Energy Conversion Devices, Inc., titled "3.00% Convertible Senior Notes due 2013" and "Common Stock," of which this Court has taken judicial notice and which are attached as Exhibits 1 and 2, respectively, to the Declaration of Allison S. Davidson (Dkt. No. 55), are dismissed as to the Credit Suisse Defendants without prejudice; and it is further

**ORDERED** that the Motion is otherwise **DENIED.**

**SO ORDERED.**

---

**13.** The Motion does not contest that the foreseeability of the loss alleged by Plaintiffs (*see* *generally* CACAC), so the Court will not address the issue of foreseeability.